The WESTERN SHOSHONE IDENTIFIABLE GROUP, represented by the TEMOAK BANDS OF WESTERN SHOSHONE INDIANS, NEVADA

v.

The UNITED STATES

No. 326–K.

United States Court of Claims.

June 3, 1981.

J. Roy Thompson, Jr., Washington, D. C., attorney of record, for the Claims Attorneys.

Robert W. Barker, Washington, D. C., attorney of record, for plaintiff. Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Thomas E. Luebben, Albuquerque, N. M., attorney of record, for the Duckwater Shoshone Tribe, the Battle Mountain Indian Community and the Western Shoshone Sacred Lands Association. Claudia Ingram, Indian Law Resource Center, and Luebben, Hughes & Kelly, Albuquerque, N. M., of counsel.

Richard L. Beal, Washington, D. C., with whom was Acting Asst. Atty. Gen. Anthony C. Liotta, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and BENNETT and SMITH, Judges.

OPINION

BENNETT, Judge:

This case comes before the court on two requests for review of the opinion and decision filed November 13, 1980, by Trial Judge James F. Merow, in the matter of a claim for attorneys' fees. The first request, filed December 15, 1980, is submitted by the claims attorneys who won a judgment of $26,145,189.89 for plaintiffs before the Indian Claims Commission.[1] The trial judge awarded the attorneys a fee of 9.1 percent of the judgment, or $2,379,212.19. The claims attorneys seek instead a fee of 10 percent of the judgment, or $2,614,518.99, the maximum allowed by statute for Indian claims cases. The difference is $235,306.80. Reimbursement of attorney expenses of $44,010.34 as ordered by the trial judge is not put in issue by the claims attorneys. The defendant United States advises the court that it considers the trial judge's decision to be correct.

The second request for review was filed on December 18, 1980, by the attorney for the Duckwater Shoshone Tribe, the Battle Mountain Indian Community, and the Western Shoshone Sacred Lands Association, jointly hereafter referred to as "Duckwater." The Association is not one of the 21 federally recognized Shoshone Bands. This request asks review of the trial judge's decision dismissing Duckwater's opposition to the award which it challenges since it considers that the claims attorneys are not entitled to a fee because of alleged unethical conduct in manipulating, suppressing, and opposing the wishes of their clients in some 17 different particulars.

We reject Duckwater's request and we reject the conclusion of the trial judge on the fee, and award the claims attorneys a full 10-percent fee for reasons which will be explained. First, however, it is necessary

---

1. This award was affirmed and is now final. *Temoak Band of Western Shoshone Indians v. United States*, 219 Ct.Cl. 346, 593 F.2d 994, *cert. denied*, 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979).

to state the facts leading up to this fee controversy in some detail, to put our conclusion in proper perspective. In so doing, we borrow freely from the careful recital of such matters by the trial judge. The case was referred to him, pursuant to Rule 54(a), by order of the court on May 23, 1980, for his evaluation and recommendation on the motion of the claims attorneys for allowance of fees and expenses. The court's order also provided for the submission of opinions and recommendations on these matters "by persons or organizations representing Indians having a pecuniary interest sufficient for standing." It was thus that Duckwater entered the proceedings by submitting extensive representations.[2] Duckwater was not a party to this litigation prior to the attorneys' fee proceedings.

The prosecution of the instant matter had its genesis in the early 1930's when a prominent Nevada attorney, Milton B. Badt, commenced activities to obtain relief for the Western Shoshone. In 1940 Dr. Ernest L. Wilkinson and his associates were requested by Mr. Badt to join in his endeavors on behalf of the Western Shoshone. Attorney Wilkinson had, pursuant to a 1929 special jurisdictional act (45 Stat. 1407), litigated claims on behalf of descendants of the Northwestern Bands of Shoshone Indians. The result obtained was unfavorable to the claimants. *See Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 65 S.Ct. 690, 89 L.Ed. 985 (1945). In 1945 Mr. Badt became a judge and turned his practice over to Orville R. Wilson. Following the 1946 enactment of the Indian Claims Commission Act, on August 16, 1947, the Temoak Bands of Western Shoshone Indians, acting for and on behalf of the Western Bands of the Shoshone Tribe of Indians, entered into a contract with attorneys Ernest L. Wilkinson and Orville R. Wilson which retained them to collect damages against the United States for "the tribe or any of its bands" for all claims relative to their lands. The attorneys were to be subject to the supervision of the Com-

missioner of Indian Affairs and the Secretary of the Interior and agreed to make no settlement without approval of the tribe and the Commissioner. In consideration for their efforts the lawyers were to be paid a contingent fee of "not less than 7% nor more than 10%" of any recovery obtained, plus necessary, verified expenses as approved by the Secretary of the Interior. By subsequent agreement, successors in interest to Ernest L. Wilkinson are entitled to 70 percent of any fee allowed.

The 1947 contract expired in 1957 but was, by an agreement dated August 21, 1959, continued in effect, with certain amendments, until April 30, 1968. The 1959 agreement provided that if the claims of the Western Shoshone Indians were not finally resolved by April 30, 1968, the contract:

> * * * may be extended by the Commissioner of Indian Affairs or his duly authorized representative, upon request of the Attorneys, for successive periods of two years thereafter until said claims have been finally determined.

It is undisputed in this matter that petitioning counsel performed substantial services under the 1947 contract and its several extensions, leading to the substantial monetary award which was appropriated December 19, 1979, in accordance with 31 U.S.C. § 724(a). Ernest L. Wilkinson gave liberally of his time and talents in providing assistance to Members of Congress responsible for the drafting of the Indian Claims Commission Act, which created a forum in which the monetary claims could be asserted. In preparation for the assertion of a claim before the Indian Claims Commission, substantial archival research and document analysis were required. A petition and alternative pleadings were prepared and filed with the Indian Claims Commission on August 10, 1951. Docket Nos. 326, 366, 367 were assigned to the claims as filed. Expert witnesses were then located and poten-

---

**2.** These opposition submissions consisted of a memorandum of 113 pages and over 600 pages of documentary material contained in four bound volumes (18 affidavits and 83 numbered exhibits).

tial documentary evidence was assembled by these experts. Claims concerning adjoining lands were investigated. All documents assembled were examined, analyzed and indexed. In June of 1957, final preparations were commenced for a trial limited to the title aspects of the claim, i. e., the extent of aboriginal possession, and the status of the claimants as an identifiable group (or groups) of American Indians. This trial was held in Denver, Colorado, commencing August 28, 1957. Plaintiff presented Dr. Omer C. Stewart as its principal expert, together with 422 exhibits selected from the over 4,000 documents assembled. At a second session in September 1957 the testimony of Dr. E. Adamson Hoebel was presented. Upon the closing of proof, the transcript was reviewed, the record analyzed, and legal matters researched in preparation for the submission of proposed findings of fact and a brief. These submissions, totaling 210 pages, were filed on February 16, 1961. Defendant's submissions were analyzed and a 51-page response was prepared and filed on September 19, 1961.

On October 16, 1962, the Indian Claims Commission issued its decision and findings. 11 Ind.Cl.Comm. 387 (1962). Rather than finding one Shoshone Tribe qualified to assert a claim, the Commission found several identifiable groups (one being the Western Shoshone) and found that each had exclusive use, occupancy and possession of large areas of land until this land was taken by the United States or ceded to it. With respect to the Western Shoshone claim, the Commission's findings stated (in part):

25. * * * With respect to the lands of the Western Shoshone Indians which were located in the present State of California, * * * the Commission finds the United States acquired such portion of the Western Shoshone Indian title without payment of compensation on March 3, 1853. * * *

26. The Commission further finds that the Goshute Tribe and the Western Shoshone identifiable group exclusively used and occupied their respective territories * * * (except the

Western Shoshone lands in the present State of California) until by gradual encroachment by whites, settlers and others, and the acquisition, disposition or taking of their lands by the United States for its own use and benefit, or the use and benefit of its citizens, the way of life of these Indians was disrupted and they were deprived of their lands. For these reasons the Commission may not now definitely set the date of acquisition of these lands by the United States. The Commission, however, finds that the United States, without payment of compensation, acquired, controlled, or treated these lands of the Goshute Tribe and the Western Shoshone group as public lands from date or dates long prior to this action to be hereinafter determined upon further proof unless the parties may agree upon a date. [11 Ind.Cl.Comm. at 415–16.]

As the next step in prosecuting the claim was to establish the value of the lands involved, potential expert witnesses (appraisers) were located. To obtain funds needed for the compensation to be paid to expert appraisers, open meetings were held at four locations in Nevada during the period of September 28-October 1, 1965, to enable the Western Shoshone Indians to establish and select a claims committee to apply for a loan from the Interior Department. A claims committee was established, a $145,000 loan was obtained, and appraisal experts were retained. The question left open by the Commission as to a "taking date" for the Western Shoshone area (other than the California lands) was then resolved by a stipulation that the Nevada portion should be valued as of July 1, 1872. 29 Ind.Cl.Comm. 7 (1966).

An 8-day trial on valuation was held in San Diego, California, in September of 1967. After analyzing and digesting the record, on April 30, 1968, counsel filed plaintiff's proposed findings (152 pages) with citations (192 pages) and plaintiff's brief (41 pages). Submissions in response to defend-

ant's filings were prepared and filed on April 17, 1969. Oral argument was presented to the Commission on October 26, 1971.

On October 11, 1972, the Commission issued its decision, 29 Ind.Cl.Comm. 5, finding the following values:

| | | |
|---|---|---|
| (1) | Western Shoshone lands in Nevada (July 1, 1872) ---------------------- | $21,350,000 |
| (2) | Western Shoshone lands in California (March 3, 1853) --------- | 200,000 |
| (3) | Profits lost from ores mined in Nevada prior to the taking date ------------------------------ | 4,604,600 |
| | Total ------------------------------ | $26,154,600 |

Counsel opposed a motion for rehearing and proceeded to the preparation required for a resolution of the question of potential offsets to be asserted by defendant against the value amount found by the Commission. A 1-day trial on the offset issue was held on October 9, 1973 (166 pages of transcript). Plaintiff's proposed findings of fact and brief (114 pages) were filed on January 24, 1974, and, following the filing of defendant's submissions, plaintiff's responses (37 pages) were filed on March 5, 1974.

On April 17, 1974, the Western Shoshone Legal Defense and Education Association, through counsel, petitioned the Indian Claims Commission for a stay of proceedings and for leave to present an amended claim. Petitioning counsel opposed this motion and defendant filed a motion to dismiss it. Oral argument was presented. Petitioning counsel prepared and submitted a memorandum on the issue of collusion. The crux of the petition for a stay was the assertion that Indian title to the greater portion of the aboriginal lands of the Western Shoshones in Nevada had not been extinguished, with the result that the Temoak Bands and the United States had collusively included, within the Docket No. 326–K claim, lands still possessed by the Western Shoshones, thus "selling" these lands to the United States. A stay was requested pending a decision by the United States District Court in *United States v. Dann*, Civ. No. R–74–60 (D.Nev.), a trespass action brought

by the United States against several Western Shoshone Indians who claimed present Indian title to the land they were occupying. On February 20, 1975, the Indian Claims Commission issued its opinion and order dismissing the Association's petition. 35 Ind.Cl.Comm. 457. Upon appeal to this court, petitioning counsel prepared and filed a motion to dismiss the appeal and, in response to a request made by the court during oral argument, prepared and submitted a memorandum on the issue of "collusion." By its opinion of February 18, 1976, this court denied the motion to dismiss the appeal and ruled, on the merits, that the Commission did not err in rejecting the petition to present an amended claim and for a stay of the proceedings. *Western Shoshone Legal Defense & Educ. Ass'n v. United States*, 209 Ct.Cl. 43, 531 F.2d 495, cert. denied, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).[3]

In 1976 petitioning counsel's contract was extended through April 30, 1978.

Pursuant to a November 14, 1976, resolution of the Business Council of the Temoak Bands, on November 15, 1976, the Temoak Bands, *pro se*, moved the Commission to stay all proceedings in Docket No. 326–K. The Temoak Bands also proceeded to discharge Robert W. Barker as attorney for the plaintiff in this matter. In a letter to the Secretary of the Interior, dated January 19, 1977, Leslie Blossom, Chairman, Temoak Bands of Western Shoshone Indians, stated (in part):

There are many strange things about the way these lawyers have operated. They no longer report to us but to a "claims committee" which was elected by just a few Indians and has no rules or any way for the people to control them. These lawyers not only have refused to protect the title to the lands we still have but have fought our people who have tried to do it themselves through the Western Shoshone Legal Defense and Education Association.

---

**3.** Petitioning counsel also prepared and filed an opposition to the petition for certiorari filed in the *Supreme Court*.

We have now fired these lawyers and are looking for a replacement.

\* \* \* \* \* \*

On April 7, 1977, Reid Peyton Chambers of the law firm of Sonosky, Chambers & Sachse filed an entry of his appearance in this matter (together with a copy of his contract) as new counsel retained by the Temoak Bands.[4]

After gaining the concurrence of the Western Shoshone claims committee, petitioning counsel moved that the Commission hold meetings in Nevada to inform all Western Shoshone Indians of the issues involved and obtain a vote as to whether the Docket No. 326–K proceedings should be stayed. This motion was opposed by the Temoak Bands, and petitioning counsel responded to the opposition. Oral argument was held by the Commission on July 18, 1977. By order of August 15, 1977, both the Temoak Bands' motion for a stay and petitioning counsel's motion for meetings were denied. 40 Ind.Cl.Comm. 305. The Commission also issued its ruling on the offset issues previously tried and briefed, allowing $9,410.11 in offsets out of the $436,194.77 claimed by defendant. A final judgment of $26,145,189.89 was entered in favor of the Western Shoshones. 40 Ind.Cl. Comm. 318.

On November 11, 1977, the Temoak Bands filed a notice of appeal from the denial of the motion for a stay of proceedings and on November 15, 1977, the United States filed a notice of appeal from the portion of the award involving profits lost on minerals removed prior to the taking date. Petitioning counsel only participated in the appeal with respect to preserving the judgment obtained. To this end, a brief was prepared and filed on August 1, 1978, in opposition to the Government's appeal. Petitioning counsel's contribution during oral argument was limited to the mineral loss aspects of the claim appealed by the United States. As noted previously, this court then issued its opinion, affirming the Commission's decision and the judgment is now final.

Accordingly, it can be seen that petitioning counsel have devoted extensive and effective efforts over a long period of time to the prosecution of a monetary claim on behalf of the Western Shoshone Indians, and that these efforts have produced an award of $26,145,189.89 in compensation for lands and minerals determined to have been taken from the Western Shoshone Indians.[5]

By the submissions filed February 22, 1980, petitioning counsel requested a ruling that they receive, out of the judgment obtained, the fee and expenses here contested by Duckwater. The opposition to any payment to counsel which has been filed in this matter is stated to be premised upon " \* \* \* a profound conviction that egregious attorney malpractice has been committed \* \* \* " and on:

> \* \* \* the belief that, pursuant to the factors generally considered by the courts in awarding contingent compensation to attorneys, the claims attorneys who prosecuted Docket 326–K are not entitled to attorneys' fees or expenses.

An analysis of the extensive submission filed in opposition to payment of fees or expenses can, however, only lead to the conclusion that its underlying premise is identical to that previously asserted and rejected both before the Indian Claims Commission and this court. It has been finally determined in this litigation that plaintiff's lands were taken by March 3, 1853 (California area) and July 1, 1872 (Nevada area). This is the law of this case and cannot be ignored, evaded or relitigated in the process of determining the amount, if any, of attorneys' fees and expenses which

---

4. Mr. Chambers and his law firm have disclaimed any interest in the contingent fee involved in this proceeding.

5. In counsel's motion for determination and allowance of fees, petitioning counsel also list substantial collateral efforts carried out, in part, in support of the Western Shoshone claim, such as: (1) opposition to bills to repeal the Indian Claims Commission Act; (2) consultations concerning other cases involving similar legal issues; (3) filing briefs *amicus curiae* in other similar cases.

are to be paid. *Northern Helex Co. v. United States*, 225 Ct.Cl. ——, 634 F.2d 557 (1980); *United States v. Turtle Mountain Band of Chippewa Indians*, 222 Ct.Cl. ——, 612 F.2d 517 (1979).

The premise, which is central to the fee and expense opposition that has been filed, is that certain lands on which plaintiff had a right of occupation and use were actually not "taken" prior to the final entry of judgment in this case. The order entered on April 25, 1980, in *United States v. Dann*, Civ. No. R–74–60 BRT (D.Nev.), is relied upon for the validity of this proposition, although this decision has been appealed. The simple answer to this premise is that the district court's ruling is not in accord with the final determination reached in the instant matter, and this court's, not the district court's, rulings control with respect to the fee and expense determinations which now must be made. A careful review of the affidavits and exhibits submitted in support of the opposition to fees and expenses makes it clear that a number of Western Shoshone Indians sincerely do not accept the determination reached in this matter concerning the taking of lands and do not consider that their interests have been served by the receipt of monetary compensation for the loss of these lands as of 1872.[6] However, this situation was addressed in the prior decisions rendered in this matter and ruled not to constitute a valid basis for reopening or rejecting the determinations made, including those as to the taking of the land. Instead, these determinations have been affirmed. No allegation of "malpractice" is set forth in opposition to the payment of fees and expenses which does not have at its root the concept

that Western Shoshone lands were not taken until the final judgment was entered in this case. As such, no issue of fact as to "malpractice" (as that term is used in the opposition filing) is presented which is open for trial.[7]

The questions open for resolution in this case are what amount of attorneys' fees and what expense reimbursements are appropriate and reasonable under the Indian Claims Commission Act and the criteria generally recognized as applicable in the federal courts to the resolution of such fee and expense questions.

In *Cherokee Nation v. United States*, 174 Ct.Cl. 131, 146–47, 355 F.2d 945, 953–54 (1966), the court set forth 13 factors as tests for reasonableness generally considered in awarding compensation to attorneys, as follows:

(1) The nature of the undertaking and the character of the services required.

(2) The responsibility assumed.

(3) The professional repute, standing, ability and experience of counsel.

(4) The services rendered, including the time and labor required.

(5) The magnitude and importance of the cases.

(6) The novelty and difficulty of the questions involved.

(7) The opposition encountered.

(8) The results accomplished and the benefits flowing to the clients.

(9) The professional competence displayed, including skill, industry and diligence.

(10) The fidelity of counsel to the interests of their clients.

6. The affidavits and exhibits do not demonstrate opposition to the receipt of monetary compensation ($4,604,600) for the minerals removed prior to the land valuation dates. Moreover, the major opposition to the acceptance of the determinations of taking appears to be addressed to the 18 million acres of fair to poor grazing lands which represented only $2,700,000 of the $21,350,000 value found for Nevada lands. 29 Ind.Cl.Comm. 5, 30 (1972).

7. The affidavits and exhibits submitted do contain assertions that petitioning counsel misled

the Western Shoshone as to the nature of the claim to be brought and its purported effect upon their Indian title, but viewed in their entirety the affidavits and exhibits make it clear that the monetary nature of the claim was explained by counsel as was the concept that compensation would be sought for the lands taken. The fact that such knowledge was sufficiently possessed by the Western Shoshone is implicit in the prior decisions rendered in this matter citing the long delay, even preceding the opposition filings which commenced in 1974.

(11) The contingent nature of the employment and the hazards and risks involved.

(12) The loss of income and opportunities for other employment due to employment of counsel in the litigation for which compensation is to be awarded.

(13) Customary charges and going rates of attorneys for similar services.

The foregoing criteria in the *Cherokee Nation* case were taken from a finding in an earlier case, *Confederated Bands of Ute Indians v. United States*, 120 Ct.Cl. 609, 667 (1951).[8] In a General Order dated December 15, 1978, this court directed the attorneys in all Indian claims cases transferred to the court from the Indian Claims Commission upon its demise to be generally guided by the standards set forth in the *Cherokee Nation* decision. The claims attorneys say that they have followed those guidelines and by so doing are entitled to the full 10 percent allowed. Section 15 of the Indian Claims Commission Act, 25 U.S.C. § 70n (1976), as now administered by this court pursuant to the Act of July 20, 1977, Pub.L. No. 95–69, 91 Stat. 273, and the Act of October 8, 1976, Pub.L. No. 94–465, 90 Stat. 1990. Section 15 provides:

* * * The fees of * * * attorneys for all services rendered in prosecuting the claim in question, whether before the Commission or otherwise, shall, unless the amount of such fees is stipulated in the approved contract between the attorney or attorneys and the claimant, be fixed by the Commission at such amount as the Commission, *in accordance with standards obtaining for prosecuting similar contingent claims in courts of law*, finds to be *adequate compensation for services rendered and results obtained, considering the contingent nature of the case*,

plus all reasonable expenses incurred in the prosecution of the claim; but the amount so fixed by the Commission, exclusive of reimbursements for actual expenses, shall not exceed 10 per centum of the amount recovered in any case. * * * [Emphasis added.]

The trial judge encountered difficulties in applying these *Cherokee Nation* factors because they overlap. It was especially difficult here because 22 attorneys had been involved on behalf of the Indians in this case in which representation commenced in 1932 and the petition was filed in 1951. The contract in this case did not provide for a flat 10–percent fee or a fee of not to exceed 10 percent, as many such contracts have done. Instead, the contract provided for a fee of not less than 7 percent nor more than 10 percent of the amount of recovery, if any. Using the 7 percent as a point of beginning, the trial judge applied a "lodestar" theory [9] to the claim for fees and used 7 percent as the lodestar or starting figure ($1,830,163.29), which he found to be reasonable and well earned. The lodestar figure was adjusted upward to 9.1 percent by (1) allowing 10 percent of it for the excellent quality of the legal work performed, (2) 10 percent for the contingent nature of the success to be anticipated and the fact that compensation has been delayed so long relative to the time that the work was expended, and (3) 10 percent for the collateral activities engaged in by counsel of benefit to this claim of the Indians. By these adjustments, the trial judge reached the fee of $2,379,212.19 he would award. He found that he could not award more primarily because of the absence of a record of reasonable attorney hours and rates which could be applied to the computation.

---

8. In that case the court awarded a fee of 8.75 percent of a judgment of $31,938,473.43, or $2.8 million. The judgment was based on a settlement and was thus not carried as far in litigation as the instant case. This consideration had a bearing on the fixing of a fee under 10 percent.

9. In non-Indian cases where a lodestar theory has been employed, the figure is set by multiplying the hours reasonably expended by a reasonable hourly rate. This figure is then adjusted based upon an assessment of the quality of the representation and the contingency nature of success. *Cf.* Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?*, 126 U.Pa. L.Rev. 281, 305 (1977).

■ The lodestar theory has been used by courts in other types of cases but is unprecedented in Indian tribal fee cases. We reject it as inapplicable to Indian claims cases because in these cases we are guided by a statute, unlike in the average non-Indian attorney fee case, in which, incidentally, contingent fees are ordinarily much higher. *Confederated Bands of Ute Indians, supra,* 120 Ct.Cl. at 673. The statute speaks in terms of fees allowed in "similar contingent claims" and for "services rendered and results obtained, considering the contingent nature of the case." We believe it proper, therefore, to equate this case only with other Indian claims cases in fixing the fee.

■ Any analysis of the fees we have allowed in such cases in the last decade will illustrate that with great consistency we have allowed the full 10 percent while at the same time reserving the right to award less in those rare instances where the Department of Interior objects, where the fee claim is successfully contested, or where we feel the services rendered did not justify a fee, such as claimed. Those reservations do not apply to the present case with any force whatever. We think that the trial judge was correct in his estimate of the high quality of the legal services rendered and that the complaint of those who seek to undo the efforts of almost 50 years on behalf of the Western Shoshone Identifiable Group of Indians comes far too late and is not supported by the attempted showing of malpractice. The trial judge has made a conscientious effort to do justice but we must respectfully differ with him on his application of the lodestar theory to attorney fees sought in Indian claims cases because his conclusion conflicts with the mandate of the statute pertaining to fees "in similar contingent claims," and with our precedents awarding fees of 10 percent.[10]

■ Where the attorneys have accomplished remarkable results for their clients, as they did here, the fixing of the fee is more or less a ministerial act, where the tests of reasonableness are met. This was the position taken by the Indian Claims Commission, which we have followed. *Indians of California v. United States,* 16 Ind. Cl.Comm. 631, 363 (1966). We reassert, however, our inherent power to consider the reasonableness of contingent fees and to evaluate them in light of the standards set forth in *Cherokee Nation,* but without requiring a detailed showing of all hours spent for legal services where the services and contracts predate in large measure the era when lawyers kept such records as a matter of course, or where, possibly, a new statute establishes a time record requirement. We can find nothing in the present statute, or in its legislative history, or in the decisions of the Indian Claims Commission, or of this court interpreting and applying the statute to support a requirement that attorneys show exactly the number of hours they worked on a case. Yet, the trial judge has sought to make hours and hourly rates charged the predominating factor in reduction of the fee claimed here.[11] On the

10. For instance, see:
  1. *Sioux Nation v. United States,* 650 F.2d 244 (Ct.Cl.1981);
  2. *Turtle Mountain Band of Chippewa Indians v. United States,* 650 F.2d 286 (1980);
  3. *Aleut Community of St. Paul Island v. United States,* 618 F.2d 124 (Ct.Cl.1979);
  4. *Yankton Sioux Tribe of Indians v. United States,* 618 F.2d 123 (Ct.Cl.1979);
  5. *Gila River Pima-Maricopa Indian Community v. United States,* 618 F.2d 123 (Ct.Cl. 1979);
  6. *Delaware Tribe v. United States,* 618 F.2d 122 (Ct.Cl.1979);
  7. *Saginaw Chippewa Indian Tribe of Michigan v. United States,* 618 F.2d 122 (Ct.Cl. 1979);

8. *Fort Sill Apache Tribe v. United States,* Nos. 182, 182–A (order entered June 22, 1979);
9. *Ottawa Tribe v. United States,* 618 F.2d 122 (Ct.Cl.1979);
10. *Kickapoo Tribe of Kansas v. United States,* 618 F.2d 122 (Ct.Cl.1979);
11. *Lawrence Zane, ex rel. Wyandot Tribe v. United States,* 618 F.2d 121 (Ct.Cl.1979);
12. *Creek Nation v. United States,* 618 F.2d 121 (Ct.Cl.1979);
13. *Peoria Tribe of Indians of Oklahoma v. United States,* 618 F.2d 121 (Ct.Cl.1979).

11. This case is not governed by the Equal Access to Justice Act, which is not effective until October 1, 1981. Pub.L. No. 96–481, 94 Stat. 2325 (1980). The Act provides for reasonable

contrary, section 15 of the statute which we have quoted emphasizes the results obtained in the litigation and the contingent nature of similar cases, which to us means other Indian cases.

The contingent nature of this claim and the results obtained are entitled to more weight than has been given to the section 15 statutory factors. When representation began in 1932 there was no forum which could provide any relief. To recapitulate, it was not until 1946 that the Indian Claims Commission was created due in substantial part to the efforts of Western Shoshone counsel, the late Ernest L. Wilkinson. Even then, there was no assurance that the Commission would entertain such a claim based on aboriginal or Indian title. It took some years for this issue to be settled in the Indians' favor. *Otoe & Missouria Tribe v. United States*, 131 Ct.Cl. 593, 131 F.Supp. 265, *cert. denied*, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955). During this time there was great risk that this claim would be dismissed. Even then great efforts had to be made to prevent legislative overturn of the *Otoe-Missouria* result. Thereafter, there was the substantial risk that if the Indians won, offsets for gratuities they received would wipe out any award due them. When this was overcome, there remained the problem of proof of value of the land taken. The discovery and analysis of large amounts of archival and documentary materials became necessary to presentation of the claim. Expert witnesses had to be found and paid with borrowed money. Negotiations with the United States regarding the valuation date ensued. Minerals removed had to be valued. Intervenors had to be warded off and thwarted in their efforts to seize control of the litigation from authorized representatives of the Indians. Many meetings with the Indians had

to be held. There were three trials, three sets of extensive post-trial submissions, two appeals to this court, and two unsuccessful petitions for certiorari. Some of the attorneys who first represented these Indians have not lived to witness their victory for them.

■ Inflation has intervened to reduce the buying power of the fees that will be paid to the surviving attorneys. We are impressed by the fact that interest has now been collecting since December 6, 1979, when the award was certified to the General Accounting Office, and it appears that the award has collected, in interest, an amount greater than the fees sought. The claims attorneys say that, viewed in this way, the client has gained more in 1 year from the attorneys' efforts than the attorneys will gain for half a century of effort. As we have indicated before, award of a 10-percent fee is not automatic, but it takes a substantial showing to defeat it where the results have been of substantial benefit to the Indians because of the persistent, able, and protracted efforts of their legal counsel.

Of course, a strong assault on the motion of the claims attorneys has been advanced by other able attorneys representing the minority Duckwater group of dissident Shoshones. As heretofore noted, they oppose any award of attorneys' fees and expenses on 17 grounds, including that the claims attorneys allegedly failed to serve their clients in accordance with the clients' wishes, misled their clients by high pressure tactics, opposed their clients' efforts to protect title to Western Shoshone lands, excluded the Duckwater views, are guilty of self-serving malpractice, fraud, and con-

attorneys' fees and expenses for a prevailing party in any civil action (other than tort) against the United States in any court having jurisdiction of the action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust, as, for instance, where the prevailing party unreasonably protracted the final resolution of the controversy.

Attorney fees allowed are not to exceed $75 per hour, except in certain circumstances, such as, for instance, where the court determines an increase in the cost of living to be a special factor. What impact this statute may have, if any, on claims for fees and expenses in Indian cases will have to await another case and another day.

flicts of interest, and did not represent all of the Shoshone Bands, notwithstanding the contract language so indicating. Because of the seriousness of their contentions, the court on May 23, 1980, issued an order permitting them to show to the trial judge whether their allegations of malpractice, among other things, had enough substance to present a triable issue of fact, in view of the court's decision that the law of the case had already been established and that the complaining counsel would not be heard to retry it and are estopped to assert that counsel's strategy was not in the best interests of the Indians nor in accord with their wishes.

Notwithstanding this warning, Duckwater has attempted, under cover of its malpractice allegations, to show that the Indians should be held to own the land and that it was not taken from them. Of course, it has now been held that there was a taking, and the large judgment here is to pay for it. That is what they authorized the suit for. The decision in their favor is the law of the case, and it will not be disturbed. Since the malpractice charge is based primarily on the alleged mistake of strategy in claiming a taking, and without proper authority to so claim, we do not need to treat it much further than we have already done in this opinion. The merits of the claim will not be redetermined in a proceeding for the fixing of attorneys' fees and expenses. If the Duckwater allegations had any merit, they should have been raised before the case was decided. Indeed, some of them were raised by other counsel and were found to be without merit by the Indian Claims Commission and this court.

We think that the trial judge was correct in ruling that the premise underlying the opposition expressed is not relevant at this stage of the proceedings. No lawsuit would ever end if, in the final act of determining legal fees, one must relitigate all possible alternatives to resolve whether the suit should have even been brought in the first place. The ardent and able representations of Duckwater counsel on the subjects of laches and estoppel do not persuade us in the circumstances of this case. We do not find any triable, factual issue of whether the claims attorneys committed malpractice other than in their pursuit of the claim for money damages for which they were employed under a contract approved by the Government.

The trial judge properly applied the court's May 23, 1980, order which attempted to limit the scope of Duckwater's argument. Yet, Duckwater raises issues barred by that order and seeks to rehash them. But, those issues central to the position of Duckwater, such as, for instance, the authority of the Temoak Band to contract to represent all Western Shoshone, or that the strategy of their counsel was a fraud on the Indians, have been decided in cases which the Supreme Court has declined to review. *Temoak Band of Western Shoshone Indians v. United States*, 219 Ct.Cl. 346, 593 F.2d 994, *cert. denied*, 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979); *Western Shoshone Legal Defense & Educ. Ass'n v. United States*, 209 Ct.Cl. 43, 531 F.2d 495, *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).

This panel of the court is without authority to reverse the prior decisions, to reopen the case, and to redecide it under the guise of investigating the conduct of the claims attorneys. The Duckwater counsel argue that since those decisions did not involve a contest over allowance of fees that this is a new proceeding which justifies their demands. The result, however, is the same. Again we say that, if this argument was accepted, no decision would ever be final because counsel could always think of a new issue as a basis to reopen, especially if they were, as here, not involved with all of their clients in the earlier proceedings.

## CONCLUSION

The claims attorneys' request for review of the trial judge's recommended decision is granted, and their motion filed on February 22, 1980, for allowance of attorneys' fees

and expenses is granted. The request for review by the Duckwater Shoshone Tribe, the Battle Mountain Indian Community, and the Western Shoshone Sacred Lands Association is denied. It is adjudged and ordered that Robert W. Barker, the attorney of record, for himself and on behalf of all other attorneys having an interest in the fees and expenses incurred, be awarded attorneys' fees of $2,614,518.99, plus expenses of $44,010.34, with both sums to be paid out of the $26,145,189.89 award obtained in this litigation.