**PUEBLO OF SANTO DOMINGO,**
**Plaintiff,**

v.

**The UNITED STATES of**
**America, Defendant.**

Nos. 355–A, 355–C, 355–D, 355–E, 355–G.

United States Court of Federal Claims.

Oct. 16, 2002.

Richard W. Hughes, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Enfield, Santa Fe, New Mexico, on behalf of himself and attorney of record for Plaintiff.

Frank E. Karelsen, III, New York City, former attorney of record for Plaintiff, on behalf of himself and attorney of record for claimant law firm, Karelsen, Karelsen, Lawrence, and Mason.

Thomas E. Luebben, Albuquerque, New Mexico, former attorney of record for Plaintiff, on behalf of himself and attorney of record for claimant law firm, Luebben & Hughes.

Daniel E. Rosenfelt, Rosenfelt, Barlow & Borg, Albuquerque, New Mexico, attorney of record for claimant Scott E. Borg, former attorney of record for Plaintiff.

James E. Brookshire, Chief Counsel, Complex Dispute Resolution, General Litigation Section, Department of Justice, Washington, D.C., attorney of record for Defendant.

### *OPINION*

BASKIR, Judge.

Pending before the Court in this Indian Claims case, originally filed in 1951 and settled in 2001, is the Plaintiff's Motion for Award of Attorneys' Fees and Expenses.

Pursuant to the Court's Rules, each of the attorneys who filed a fees claim in this case served the pleadings upon the Tribal Council of the Santo Domingo Pueblo Tribe of Indians ("Pueblo of Santo Domingo" or "Pueblo"). The Tribal Council has not separately filed an objection to any of the attorneys' claims or the proposed allocation of fees.

The attorneys are seeking fees and expenses pursuant to their work only on No. 355, sub-dockets A, C, D, E and G. After he

entered judgment in No. 355—B, F and H, Judge Bohdan A. Futey granted the attorneys' various motions for fees and expenses for their work on those portions of the case, for the full 10 percent.

We grant the Plaintiff's motion. This Opinion will first discuss the background of this case and the Court's authority to consider this motion, before setting forth the specific sums owed to the Plaintiff's current and former counsel. We discuss these matters at length because of the administrative and legal uncertainty involved in effectuating the matter of attorneys fees in this case.

## I. Introduction

### A. Historical Background

The Pueblo have inhabited the Rio Grande River Valley near the confluence of the Rio Grande River and the Galisteo River since before the arrival of Spanish colonists in the late 16th Century. In 1689, the Spanish Government issued a land grant to the Pueblo. Unfortunately, that grant, known as the Santo Domingo Land Grant, did not encompass all of the Pueblo's native lands. In 1748, the Pueblo purchased this additional land—approximately 50,000 acres—from the Spanish, and the deed that memorialized this transaction became known as the Diego Gallegos Land Grant.

Pursuant to the Treaty of Guadalupe–Hidalgo (Treaty), signed in 1848, which ended the Mexican War, the United States acquired sovereignty over a vast southwestern territory, including the Pueblo's land. While the Treaty recognized the Santo Domingo Land Grant, it did not specifically include the Diego Gallegos Land Grant. Consequently, the United States, the State of New Mexico, and private landowners did not recognize the Pueblo's title to that tract of land.

A 1907 re-survey of the initial Federal survey that occurred at the conclusion of the Mexican War revealed that the correct boundary of the Pueblo's land actually included the second grant, the Diego Gallegos Land Grant, as well as two other Spanish land grants. In 1928, Congress established the Pueblo Lands Board to resolve the conflicting claims to this land, which totaled about 80,000 acres. The Lands Board was not successful in reaching a compromise. There the matter stood for a time.

### B. Procedural Background

The Pueblo filed three lawsuits against various public and private defendants to settle this dispute. The instant case was initiated in 1951, when the Pueblo filed suit against the United States before the Indian Claims Commission (ICC), seeking monetary damages for trespass, lost use, and breach of the "fair and honorable dealings" provision in the Indian Claims Commission Act of 1946 (ICCA).

The case was litigated before the ICC for 27 years without resolution. The Commission was dissolved in 1978, see Pub.L. 94–465, 90 Stat.1990, and the case was transferred to this Court's predecessor, the former United States Court of Claims, on October 18, 1978, under the ICC's original docket number, 355, pursuant to Pub.L. 95–69, 91 Stat. 273.

The case was assigned to Claims Court Trial Judge Judith Ann Yanello. On October 1, 1982, pursuant to Section 403(d) of the Federal Courts Improvements Act of 1982, Pub.L. 97–164, 96 Stat. 46, 28 U.S.C. § 171, the case was transferred to the current United States Court of Federal Claims, but remained with Judge Yanello. Seven years later, on July 13, 1987, the case was reassigned to Judge Futey.

Throughout this litigation, the Pueblo had several attorneys of record. Mr. Frank E. Karelsen, III, represented the Pueblo from 1951 until May 13, 1980. He was replaced by Mr. Thomas E. Leubben, who served until August 29, 1985. The present attorney of record, Mr. Richard W. Hughes, represented the Pueblo from August 30, 1985 until January 3, 1989, when he was replaced by Mr. Scott E. Borg. The Pueblo re-appointed Mr. Hughes as counsel on September 25, 1995. In addition to these attorneys, each counsel has represented to the Court that they in turn employed a number of associate and contract attorneys as well as a multitude of experts to work on the case.

We will not recount the entire procedural history of this complex case, but we pause

here to note the unique case management procedure Judge Yanello adopted in 1978. In order to handle the multiple and overlapping land grants, the difficult and arcane issues of treaty and historical deed interpretation, and the takings, mineral and water rights claims, Judge Yanello divided the case into eight different proceedings, assigning sub-docket case numbers for each. Accordingly, the litigation was assigned Case Nos. 355–A through 355–H, and the litigants and Court worked through each of the different dockets in turn. Along the way, a few of the sub-dockets were settled by the parties. On July 26, 1988, Judge Futey entered judgment for the Plaintiff in No. 355–B, in the amount of $100,000.00; in No. 355–F, in the amount of $1,560,572.30; and in No. 355–H, in the amount of $40,000.00.

Accordingly, when this case was re-assigned to the undersigned judge on January 27, 1999, the unresolved claims included those in Nos. 355–A, C, D, E, and G.

## II. Settlement of the Pueblo's Claims

After 50 years of often intense litigation and negotiation, several lengthy published opinions from the ICC, this Court, and two appellate courts, and even a denied petition for a writ of *certiorari* to the Supreme Court, the parties reached a global settlement agreement in 2000. That the parties were able to reach a negotiated settlement in this 250–year–old dispute was remarkable, and it required the passage of legislation by Congress to complete it. As noted by the Committee Report accompanying Senate Bill S. 2917, the "Santo Domingo Pueblo Land Claims Settlement Act of 2000" (Settlement Act):

> The overlapping land grants, surveys and mis-surveys of [Pueblo] lands on both sides of the Rio Grande River, the lack of a Federal survey of the Gallegos Grant, and the Pueblo Lands Board's decisions gave rise to an array of competing claims to title to land by Indians and non-Indians. These claims have been asserted in numerous lawsuits, three of which encompass the most significant title disputes involving the lands of the Pueblo of Santo Domingo.

The agreement called for the ratification and implementation of the Settlement Act, which became law on November 1, 2000. In pertinent part, the Settlement Act, now codified at 25 U.S.C. § 1777 (2001), memorializes the compromise and universally settles the Pueblo's land claims, extinguishes their several lawsuits, provides a plan to distribute title to more than 80,000 acres of public, private, and Indian land on both sides of the Rio Grande River south of Sante Fe, New Mexico, and authorizes the establishment of the "Pueblo of Santo Domingo Land Claims Settlement Fund" (Land Claims Fund).

The land component of the Settlement Act provided that the United States would hold in trust a certain acreage of land for the Pueblo until it could be deeded over to the tribe. Second, the Pueblo were granted a two-year option to purchase, with funds from the Land Claims Fund, several thousand acres of the disputed land from the Government at a sum certain. Finally, the Settlement Act affirmed the boundaries of Indian and non-Indian land in this territory once and for all.

The monetary component provided for an immediate $8 million judgment in favor of the Plaintiff to be entered in the remaining sub-dockets of this case. Second, the Government was ordered to deposit into the Land Claims Fund $15 million in three yearly installments. On February 2, 2001, the Court signed an Order directing judgment to be entered in accordance with the Settlement Act. Consequently, the $8 million settlement was paid from the Judgment Fund at the Treasury Department over to the Land Claims Fund administered by the Office of Trust Funds Management at the Department of the Interior.

In accordance with long-standing ICC and Court of Claims practice, the Pueblo's current counsel of record, Mr. Richard Hughes, filed a motion for award of attorneys' fees, in the amount of 10 percent of the judgment, to be paid from the Land Claims Fund. Mr. Hughes' motion cited to a statute, 25 U.S.C. § 70n, authorizing this Court to award these fees and expenses. This authority was, however, problematic because Mr. Hughes advised that it had been repealed. Further,

several of the Plaintiff's former attorneys of record filed papers either opposing Mr. Hughes' proposed fees allocation or seeking payment of their fees as well.

Uncertain of this Court's authority in light of the possibly repealed statute, we ordered supplemental briefing on this motion.

## III. Discussion

### A. Court's Authority to Award Attorney's Fees in Indian Claims Cases

■ The questions remaining for resolution in this case are the Court's authority to award fees to the Plaintiff's attorneys, and in what amounts. Both parties agree that the Plaintiff's attorneys are entitled to the payment of fees and expenses, and assert that 10 percent is the norm for Indian Claims attorneys' awards. As we have noted, however, the parties stated in both their initial and supplemental written briefs that the Court's authority derived from "25 U.S.C. § 70n (repealed) of the Indian Claims Commission Act." They did not explain how a repealed statutory provision could be valid as a basis of judicial authority.

The seminal case addressing attorneys fees in Indian Claims cases is *Cherokee Nation v. United States*, 355 F.2d 945, 174 Ct. Cl. 131, 146–47 (1966). In discussing the amount of fees to be awarded, the Court noted that because many Indian Claims cases were prosecuted by attorneys on a contingency fee basis, Congress issued firm guidelines as to the maximum amounts attorneys might earn from their Indian clients. The Court stated: "Section 15 of the Indian Claims Commission Act (ICCA)," formerly codified at 25 U.S.C. § 70n, "embodie[d] the Congressional directive with respect to attorneys' fees." Section 15, in pertinent part, sets a maximum of 10 percent of the recovery, and within that limit, an "adequate" amount or one specified by contract:

> Each such tribe, band or other identifiable group of Indians may retain to represent its interests in the presentation of claims before the Commission an attorney or attorneys at law, of its own selection, whose practice before the Commission shall be regulated by its adopted procedure. The

fees of such attorney or attorneys for all services rendered in prosecuting the claim in question, whether before the Commission or otherwise, shall, unless the amount of such fees is stipulated in the approved contract between the attorney or attorneys and the claimant, be fixed by the Commission at such amount as the Commission, *in accordance with standards obtaining for prosecuting similar contingent claims in courts of law*, finds to be adequate compensation for services rendered and results obtained, considering the contingent nature of the case, plus all reasonable expenses incurred in the prosecution of the claim; but the amount so fixed by the Commission, exclusive of reimbursements for actual expenses, shall not exceed 10 per centum of the amount recovered in any case.

ICCA; § 15 (emphasis added).

The problem with citing to this statutory provision, however, is that because Congress disbanded the ICC in 1978, it appeared to the parties (and initially, to the Court as well) that the authority for the awarding of attorneys fees, 25 U.S.C. § 70n, was also repealed. *See* Pub.L. 94–465, 90 Stat.1990. Fortunately for the sake of the Pueblo's attorneys, with some digging we learned that that is not the case.

The power of the Court to award attorneys fees and expenses derives from Section 29(a) of Public Law 95–69, which transferred all ICC powers to the Court of Claims, including "the powers of the Commission... relative to fees and expenses for any attorney or attorneys for any tribe...." 91 Stat. 273, 25 U.S.C. § 70v–3. This authority was in turn transferred to the Court of Federal Claims in 1982. *See* Pub.L. 97–164, 96 Stat. 46.

Because the ICC is no longer in existence, the United States Code, as of the early 1980's, stopped printing the sections of the Code dealing with Commission rules and procedures. Additionally, for unknown reasons, the Code also omits the codification of Public Law 95–69. *See* United States Code, Volume 13, Title 25, at p. 302. This printing decision, of course, does not affect the continuing existence of the positive law. Therefore, in order to find the text of the legislation granting

the Court this authority, one must consult the original and all subsequent United States Statutes at Large.

In sum, by virtue of the continuing force of Section 29(a), Pub.L. 95–69, 25 U.S.C. § 70n continues to provide the Court's authority to award fees.

Finally, we note that at the time the Plaintiff's motion was first filed in March 2001, and when we held a hearing to discuss this matter in November 2001, the Court had not yet adopted its new Rules. The procedure for handling an attorney's fees motion, as well as this Court's authority, is now clearly set forth in the new Appendix G, "Procedure in Indian Claims Commission Cases," as adopted by the Court on May 1, 2002.

We thus may entertain and decide the Plaintiff's motion.

**B.   Standards for Awarding Fees**

█ The remaining issue is how much to award the attorneys. The Plaintiff's motion seeks 10 percent of the initial $8 million judgment (as opposed to the full $23 million dollar settlement amount), or $800,000. In *Cherokee Nation*, the Court set out 13 factors to determine if the amount of fees and expenses requested was reasonable:

(1) The nature of the undertaking and the character of the services required;

(2) The responsibility assumed;

(3) The professional repute, standing, ability and experience of counsel;

(4) The services rendered, including the time and labor required;

(5) The magnitude and importance of the cases;

(6) The novelty and difficulty of the questions involved;

(7) The opposition encountered;

(8) The results accomplished and the benefits flowing to the clients;

(9) The professional competence displayed, including skill, industry, and diligence;

(10) The fidelity of counsel to the interests of their clients;

(11) The contingent nature of the employment and the hazards and risks involved;

(12) The loss of income and opportunities for other employment due to employment of counsel in the litigation for which compensation is to be awarded;

(13) Customary charges and going rates of attorneys for similar services.

174 Ct.Cl. at 146–47, 355 F.2d 945.

█ As the text of Section 15 of the ICCA suggests, Congress may have intended that the 10 percent fee be regarded as the maximum amount, with the actual award determined by the Court after a careful analysis of each of the 13 factors. However, over time, Courts began to regard the 10 percent fee as the standard amount. Indeed, in 1981, the Court stated:

Any analysis of the fees we have allowed in such cases in the last decade will illustrate that with great consistency we have allowed the full 10–percent while at the same time reserving the right to award less in those rare instances where the Department of the Interior objects, where the fee claim is successfully contested, or where we feel the services rendered did not justify a fee.... [The] award of a 10–percent fee is not automatic, but *it takes a substantial showing to defeat it where the results have been of substantial benefit to the Indians because of the persistent, able, and protracted efforts of their legal counsel.*

*Western Shoshone Identifiable Group v. United States*, 228 Ct.Cl. 26, 40–42, 652 F.2d 41 (1981) (emphasis added).

Accordingly, while we are mindful of the *Cherokee Nation* Court's 13 factors, we are bound by more recent precedent to analyze the Plaintiff's motion using the "substantial benefit standard" as set forth by the *Western Shoshone* Court.

**C.   Merits of The Plaintiff's Motion**

█ At the outset, we would be remiss if we did not state that this case, which was pending for 50 years before it was finally concluded, required an enormous amount of care, skill, and attention from the many public and private attorneys, Commissioners, Judges, and Members of Congress who were called upon to address, and ultimately re-

dress, the Pueblo's very real grievances. However, here we are asked only to evaluate the service of the Plaintiff's attorneys.

We believe that the Plaintiff's attorneys' motion for an award of 10 percent of the judgment received by the Plaintiff is more than justified, and for at least three reasons. First, the four attorneys of record, Messrs. Karelsen, Luebben, Borg, and Hughes, were able to obtain superior results for their client, the Pueblo. The Settlement Act required an enormous amount of time and attention to negotiate and ultimately achieve its successful passage through Congress. While this achievement may have only occurred on the most recent attorney's watch, the briefing and the record of this case demonstrate that each former attorney of record played a decisive role in developing the theories, and accumulating and then presenting the evidence that ultimately persuaded the Government to settle this long-standing dispute. As the *Western Shoshone* Court stated, "the persistent, able, and protracted efforts of their legal counsel," produced a "substantial benefit" for the Pueblo. 228 Ct.Cl. at 42, 652 F.2d 41.

Second, each of the counsel of record in this case operated under a claims attorney contract with the Pueblo. Pursuant to Bureau of Indian Affairs (BIA) procedure, each counsel was required to provide a copy of the contract to the BIA for approval. Along with the Plaintiff's motion, each counsel submitted the relevant contract and BIA approval letter for the Court's review. Each contract provides that the attorney is to receive a contingency fee of 10 percent of the amount recovered from the Government. Several of the contracts also provide for the regular payment of hourly fees and some expenses. In the event of a recovery for the Pueblo, the hourly fees were to offset (and not replace) the contingent fee award.

While 10 percent of $8 million may seem like a large award, it is clear from the substantial paperwork presented, that each attorney and their law firms, especially Messrs. Borg and Hughes, invested a substantial amount of time, effort and personal expense to bring about a successful resolution of the Plaintiff's claims. Indeed, Messrs. Borg and

Hughes both stated that pursuant to their representational contracts with the Pueblo, they and their firms logged several thousands of hours preparing this case. Given the scope, magnitude, and complexity of the 8 sub-dockets, not to mention the 50–year lifespan of the case, the time estimates provided to the Court almost seem understated.

Finally, the attorney of record for the Defendant, Mr. James Brookshire, the Chief Counsel for Complex Dispute Resolution, stated that "the United States was impressed with the dedicated service of Plaintiff's counsel" and further, that the Government "appreciated the manner in which the Pueblo, its leadership, and its current counsel approached the global resolution of this dispute." This endorsement is all the more significant because the Department of Justice does not normally take a position on the "question of fees allocation falling within the allowable amount under the [ICCA]."

Thus, we are more than satisfied that allowing the Plaintiff's motion for fees in the amount of the full 10 percent of the judgment is a fair and appropriate payment for the professional services rendered by the claimants.

Counsel for the Defendant has represented to the Court that despite the clear contractual language providing a 10 percent fee between the Pueblo and their attorneys, the Office of Trust Funds Management will not release the funds to pay these fees and expenses until this Court determines that such compensation is both deserved and appropriate. We so find.

### D. Allocation of Attorneys' Fees and Expenses

After the current attorney of record, Mr. Hughes, filed his motion for fees and expenses, each of the three former attorneys of record filed responses to Mr. Hughes' proposed allocation of the fees. The attorneys then engaged in a successful mediation of their differences, and have since jointly filed a stipulation as to allocation of the fees.

As we noted, during the period Messrs. Borg and Hughes represented the Pueblo, they were paid hourly fees for a portion of

their work. Their contracts call for the hourly fees to offset any eventual contingency fee recovery on final judgment. Mr. Hughes was paid a total of $199,208.00 and Mr. Borg was paid a total of $87,421.00. Thus, they have stipulated that their portions of the $800,000 fee award will be reduced by those amounts.

According to the stipulation as to the allocation of fees, the following attorneys' fees are due:

| | |
|---|---|
| Frank E. Karelsen, III | $ 10,000.00 |
| Scott E. Borg | $185,000.00 |
| Richard W. Hughes | $318,371.00 |

Mr. Leubben assigned his interest in any fees to Mr. Borg, and filed a notice of waiver of claim for his attorney's fees.

Further, the following expenses are also due:

| | |
|---|---|
| Scott E. Borg | $ 10,753.13 |
| Richard W. Hughes | $ 20,495.13 |

**IV. Conclusion**

For the reasons stated, **the Plaintiff's Motion for Award of Attorneys' Fees and Expenses is GRANTED,** in the amount of 10 percent of the initial judgment previously awarded to the Plaintiff ($8 million), less any amounts already paid to the attorneys in the form of hourly fees. **The fees and expenses are to be paid out of the Santo Domingo Land Claims Fund,** administered by the Office of Trust Funds Management.

This Opinion, accompanied by an authorizing resolution issued by the Pueblo Tribal Council, shall constitute authority to distribute to the Plaintiff's attorneys and former attorneys the fees and expenses detailed above.

The Clerk of Court is directed to send copies of this Opinion to the current attorneys of record for the Plaintiff and the Defendant, as well as to the attorneys of record for each claimant. Further, the Clerk is directed to send a copy of this Opinion directly to the Pueblo Tribal Council.

Notwithstanding anything to the contrary in the Rules of the Court of Federal Claims, **the parties shall have 30 days from the date of this Opinion in which to file a motion for reconsideration or amendment.** If no such motion is filed, pursuant to Appendix G, the Clerk of Court is directed to make the appropriate docket and sub-docket entries closing this case. Each party to bear its own costs on this motion.

**IT IS SO ORDERED.**