**WHITE MOUNTAIN APACHE TRIBE OF ARIZONA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 22–H.

United States Claims Court.

Feb. 20, 1992.

See also 20 Cl.Ct. 371.

William H. Veeder, Washington, D.C., for plaintiff.

James M. Upton, Washington, D.C., with whom was Acting Asst. Atty. Gen. Barry M. Hartman, for defendant. Glen R. Goodsell, of counsel.

## OPINION

NETTESHEIM, Judge.

### INTRODUCTION

This second phase of litigation between the White Mountain Apache Tribe of Arizona ("plaintiff") and the Government addresses principally accounting claims. The first phase, covering claims for resource mismanagement, was tried in 1986. *White Mountain Apache Tribe of Arizona v. United States*, 11 Cl.Ct. 614 (1987). At issue are claims for alleged improper accounting and disbursements of funds from Indian Moneys Proceeds of Labor ("IMPL") and Individual Indian Money Accounts ("IIM"), as well as three other claims. Trial on plaintiff's IMPL and IIM claims began in late 1991 and will resume in March 1992. The other three claims, properly classified as both resource mismanagement and accounting claims, have been litigated fully and are the subject of this opinion.

The first claim concerns any losses sustained by plaintiff from the alleged failure of the Government, operating through the Department of Interior, Bureau of Indian Affairs (the "BIA"), to obtain adequate

grazing fees from non-Indian permittees who leased tribal rangelands to graze their livestock. The second claim pertains to whether the Government failed to obtain adequate stumpage rates for tribal timber covered by the 1917 Unit One sale, as well as other pre–1946 sales contracts. The third claim involves whether the Government allowed disposal of tribal timber during the period from 1871 to 1946 to third parties without compensation to plaintiff.

## DISCUSSION

As in the 1986 trial, the source of the Government's duty differs from claim to claim. *See White Mountain Apache Tribe*, 11 Cl.Ct. 614 at 619. The Government's trust obligation to plaintiff with respect to overseeing the tribe's rangeland arises out of the Secretary of the Interior's control over the rangeland as a source of tribal revenue. *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980). As to the stumpage claim and the disposal of timber claim, the source of the Government's duty derives from its "elaborate control over forests and property" belonging to plaintiff. *United States v. Mitchell*, 463 U.S. 206, 224, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983). In the event the Government breached its fiduciary duty to plaintiff, it should be held liable for damages resulting from that breach. 463 U.S. at 226, 103 S.Ct. at 2972.

### I. *Claim for grazing fees*

In order to substantiate its claim that the tribe lost income because of the Government's failure to obtain adequate grazing permit fees, plaintiff introduced, as an expert in botany and range management, Dr. Joe C. Elliott. Dr. Elliott was qualified as an expert in the first phase of the litigation. *White Mountain Apache Tribe*, 11 Cl.Ct. at 648. The witness relied on his experience with and on the Fort Apache Indian Reservation (the "reservation"), as well as on archival information on common practices related to grazing lands, to prepare a report entitled Income Losses to the White Mountain Apache Tribe from Leasing Grazing Lands at Fees Below Fair Market Value. Dr. Elliott testified that in formulating his theory and opinions on whether the fees received were proper, he relied on trust principles articulated in *Blackfeet and Gros Ventre Tribes v. United States*, 32 Ind.Cl.Comm. 65 (1973), which, in his view, requires that a BIA superintendent lease Indian land for the sole and exclusive benefit of the tribe occupying that land.

Dr. Elliott indicated that there are two methods of evaluating whether the fees charged for grazing permits were proper. First, one might employ an appraisal method to determine whether the fees for grazing permits on the reservation were similar to fees charged for grazing permits in comparable settings. The definition of comparability would be determined by such factors as similar environment; similar range condition; and similar amenities on the land, such as fences and water sources. Second, there might be evidence of a competitive bidding program. According to Dr. Elliott, since it is generally accepted that in a free market, competitive bidding would result in a fair market value, the existence of such a program on the reservation might demonstrate the propriety of the rangeland permit program.

With respect to the appraisal method, although Dr. Elliott initially examined fees of federal, state, and private lands, the parties agreed that fees of federal and state lands were not comparable, since they were administrative fees set by legislators. As to private lands, Dr. Elliott examined land located just north of the reservation belonging to the Aztec Land & Livestock Co. ("Aztec"), a wholly-owned subsidiary of the Atlantic & Pacific Railroad. Dr. Elliott testified that although initially the Aztec land might appear comparable and thus an appropriate basis to appraise the value of grazing permits on the reservation, he concluded that the Aztec land, in fact, was not comparable. The primary reason for his determination was that Aztec had imported Texas cattle and grazed its land heavily since the beginning of the Nineteenth Century, thereby severely degrading the range. Because of the drought and unstable market of the late 1800's, ranchers

were unable to sell their stocks and necessarily kept them on the range. By the end of the Nineteenth Century, the land had been severely eroded. The evidence presented at trial revealed that Aztec was charging $.025 per acre per year for grazing fees. On the reservation each animal required approximately 90 acres per year. Were that the case at Aztec, the fee per animal per year would have been $2.25. Dr. Elliott cited this difference in grazing fees as evidence that the two rangelands could not have been comparable because $.025 was much lower than the fee utilized on the reservation.

Next, Dr. Elliott looked at the bidding program in place on the reservation to determine if competitive bidding had been instituted and concluded that it had not. The evidence relied on by Dr. Elliott reveals that a close relationship existed between potential lessors and those regulating the grazing permits. He testified that the leasing program first operated on a large scale in 1906 during the term of Fort Apache Agency Superintendent C.W. Crouse. Superintendent Crouse was determined to lease grazing land at $1.00 per head of cattle per annum. This figure, testified Dr. Elliott, was an arbitrary amount selected by Superintendent Crouse that the superintendent considered would not receive opposition by potential lessees. In a letter dated June 18, 1909, from Superintendent Crouse to the Commissioner of Indian Affairs, the superintendent stated that he had set a price of $1.00 per head because he did not believe the lessees could afford to pay more than that amount. In a later letter to Superintendent Crouse dated May 12, 1911, Second Assistant Commissioner of Indian Affairs C.F. Hauke took issue with Superintendent Crouse's method of permit allocation:

It is not believed that a charge of $1 per head for cattle and horses and 25¢ for sheep is a fair return to the Indians for the use of grazing land on the Fort Apache reservation and it is thought that all persons interested should be given an opportunity to bid for grazing privileges.... On a number of the reservations there have been considerable increases in the amounts received for grazing privileges under the system of letting grazing privileges under sealed bids. You are, therefore, requested to cooperate with the Office in putting the circular in force on the reservation under your charge.... [1]

Superintendent Crouse often informed prospective permittees before any bidding of the amount that he considered would be successful in securing a permit. The First Assistant Secretary of the Interior wrote a letter to the Commissioner of Indian Affairs dated April 27, 1912, indicating that he, the First Assistant Secretary, had just rejected a number of bids that were determined not to be within any competitive bidding scheme. The Assistant Secretary blamed the failure of the bidding system on Superintendent Crouse, who gave information to the bidders on which bids would be successful and who underestimated the carrying capacity of the range, such that the permittees were not paying for all the stock they grazed. Subsequently, Superintendent Crouse was subjected to an investigation and forced to resign for his misconduct.[2] After Superintendent Crouse was ousted for acting outside the interests of the tribe and perpetuating his own interests, he was replaced by Superintendent William M. Peterson.

The BIA had strayed far enough away from the concept of competitive bidding toward negotiated bidding that by 1914, although the superintendents still discussed the feasibility of competitive bidding, such a system had not been implemented. Dr. Elliott testified that there remained on the reservation a bias or predisposition against competitive bidding. The

---

1. The circular itself was not put into evidence.

2. A letter dated December 2, 1912, discussing Superintendent Crouse's forced resignation was introduced for the first time in this phase of the litigation. It was not a part of the evidence in the first trial on the mismanagement phase tried in 1986, and the court restricted the use of the document to this phase only. Reevaluating the findings issued in early 1987 based on evidence tendered in late 1991 would be unjustified.

evidence disclosed that in 1915 bidding remained non-competitive, with leases offered to those permittees in "good standing." In a letter dated December 10, 1915, Commissioner of Indian Affairs Cato Sells wrote to Assistant Secretary of the Interior Bo Sweeney recommending this method of permit allocation. Assistant Secretary Sweeney approved the recommendation.

Following Superintendent Crouse's resignation, Superintendent Petersen continued the practice of negotiating fees with prospective and actual permittees. Dr. Elliott testified that Superintendent Petersen was a prime example of an Indian agent who negotiated grazing fees based on his close relationship to non-Indian permittees. In a letter dated April 26, 1915, Superintendent Petersen recommended, *inter alia*, that permittees who were then on the range be entitled to per annum fees of $2.00 per head for cattle and horses and $.40 per head for sheep and be granted their range permits without competition for five years.

The practice of allowing permittees to continue to lease rangeland without bidding competitively continued throughout the tenure of Superintendent Charles L. Davis, who succeeded Superintendent Petersen in 1916. Later, concern over lease rates led the White Mountain Stock Growers Association, aided by senators from Kansas and Arizona, to marshall political support for lower grazing fees. To obtain security for grazing, the stockgrowers attempted to set fees for grazing permits based on a percentage of the sale price of cattle. When the stockgrowers suggested that 5 percent of the sale price was an adequate grazing fee, Commissioner of Indian Affairs Charles Burke became involved in the discussions, and eventually a negotiated settlement was completed. This settlement, however, provided that the grazing fee percentage would be 7 percent of the market price, not 5 percent, as the stockgrowers had originally requested. In return, the stockgrowers would retain their range permits for the 5–year period from 1922 to 1927, thereby ensuring that the individual permittees would avoid yearly challenges during that period from higher bidders.[3]

The policy of charging 7 percent of the sale price was short-lived. In 1923 Superintendent Davis altered the grazing fee to a flat annual fee of $1.75 per head. A December 21, 1923 letter from Joseph Wingfield, Supervisor of Livestock, to Commissioner Burke indicates that Superintendent Davis did not believe that altering the policy would meet any opposition. Dr. Elliott attributed the lack of opposition by the stockgrowers to the rate change to the fact that the $1.75 rate represented a reduction in what they were paying—the 7 percent was roughly equivalent to $2.40 per head, an amount far less attractive to the stockgrowers.

According to Dr. Elliott, the primary reason why competitive bidding was not instituted on the reservation until 1953 was political. In his view the superintendents enjoyed close relationships with the non-Indian permittees and found it expedient to assess fees with which the permittees were entirely comfortable. The evidence showed that permittees were even able to convince legislators to intervene on their behalf with the superintendents when the permittees were not satisfied with the grazing fees. The financial considerations of landowners figured prominently into the fees set by the various agency superintendents.

A 1983 Colorado State University study entitled Grazing Lease and Fee Arrangements of Western Governments and Agencies for Study of Western State Local Governments and Other Federal Agencies Grazing, Leasing Arrangements and User Charges concluded that negotiated fees were not a mechanism whereby regulators could ensure that fair market value was paid by permittees for their grazing permits:

> Bidding procedures and auctions most closely approximate a competitive free market and should determine a fair market price. Long periods between bids or auctions resulted in dated and possible

---

**3.** This price could also be circumvented or the leases terminated by order of the Secretary of the Interior or by extinguishment of the title of Indian claim to the land in question.

unsuitable fees.... Fees determined by this method required little or no subjective judgments on the part of agency personnel and are less subject to political pressures.

. . . .

Negotiated fees are most useful when the leasing agency has special interests other than equity of fees and obtaining a fair grazing rate; e.g. wildlife agencies who want to maintain a wildlife habit. Negotiated fees are subject to political pressures, pressures of friendships between agency personnel and lessees, or other subjective judgments on the part of agency personnel....

Dr. Elliott's opinion was that the lease rates, applying either the flat-fee formula or percentage of sales, were not competitive. Political concerns and concern for the financial well-being of the stockgrowers led the various superintendents charged with setting the grazing fees to pursue negotiated settlements rather than competitive bidding. As a result the tribe lost grazing fees which it likely would have received were the bidding competitive. The court considers this opinion to be reasonable.

In assessing damages for failure to charge proper grazing fees, Dr. Elliott began with the 7–percent figure, which he then adjusted upward to reflect the discount resulting from political pressure and other factors rendering the bidding non-competitive, arriving at a figure of 8 percent. Dr. Elliott considered the 8–percent figure insufficient, but indicated that he arrived at this figure by taking into account the logic with which the agent was working in the early 1900's. The court deems this limitation reasonable, since hindsight analysis from the vantage point of late Twentieth–Century land-use science cannot be determinative on how Indian agents should have discharged their duties in the early part of the century.

Dr. Elliott then obtained sale prices for cattle in Arizona from the Bureau of Agriculture and compared them to prices in the rest of the United States. He testified that Arizona prices amounted to approximately 85 percent of national prices. Therefore, he multiplied 85 percent of the national prices for cattle by 8 percent, the negotiated 7–percent figure adjusted upward to compensate for the non-competitive factors involved in the negotiating/bidding process. From these calculations Dr. Elliott arrived at a damage figure of $649,671.00, reflecting deficits in tribal income due to the permit system in use on the reservation between 1905 and 1947.

Defendant sought to countervail Dr. Elliott's testimony through its own expert, Dr. John P. Workman, who had been qualified as an expert in appraisal and range management during the earlier trial in 1986. *White Mountain Apache Tribe*, 11 Cl.Ct. at 665. Dr. Workman's specific task was to review the report prepared by Dr. Elliott and to analyze the method for calculating damages utilized by Dr. Elliott in preparing his report. The thrust of Dr. Workman's testimony was that although the permit bid system on the reservation had its share of problems, the system worked well enough. Dr. Workman characterized the fees for grazing permits on the reservation as similar to those in the surrounding areas in the State of Arizona and the Southwest.[4]

According to Dr. Workman, Aztec illustrated the prime example of comparable lease rates. After adjusting lease rate figures to account for differences in services provided on the reservation and Aztec lands, Dr. Workman attempted to demonstrate that the fees received on the reservation were close to the fees normally charged for leasing permits on private lands. Dr. Workman's contention was that although the bidding system was imperfect, the grazing fees for non-Indian permittees reflected a fair market value.

As to Dr. Workman's testimony on the fairness of the bidding system and the similarity of grazing fees between the reservation and Aztec, the court cannot accept his

---

**4.** Since the parties agreed that the rates charged by the Forest Service, Bureau of Land Management, and the States of Arizona and New Mexico were not comparable to fees for grazing on the reservation, Dr. Workman was allowed to testify only about Arizona private lands.

rationale. First, Dr. Elliott established that the disfunction of the bidding system went far beyond the mere imperfection conceded by Dr. Workman. Dr. Elliott's testimony took into account the political and economic pressures under which the various superintendents operated—pressures that compelled them to negotiate permit fees rather than use the bidding system. Plaintiff introduced documents in conjunction with Dr. Elliott's testimony that demonstrate the close relationship existing between the superintendents and the stockgrowers associations. The evidence reflects that non-Indian permittees did not always pay for all of the cattle that they grazed on the range and that the superintendents were more likely than not to allow tenured stockgrowers to remain on the range without instituting competition for permitted grazing on what was at one time fertile forage land.

Moreover, plaintiff's documentary evidence reveals a pattern of misconduct or misfeasance on the part of several superintendents, most notably Superintendent Crouse, who was forced to resign for failing, at least in part, to monitor adequately the tribe's grazing permit system and for favoring stockgrowers to the detriment of the tribe. Under cross-examination Dr. Workman admitted that he had not considered these documents when he prepared his report advancing the theory that the bidding system was fair to the tribe. Although he testified that he continued to have confidence in his findings, Dr. Workman reluctantly admitted that had he been aware of the documents related to misconduct of the superintendents, his report might have been different than the one he presented.

The court does not find that the Aztec range was comparable to the reservation's rangeland, most notably because the carrying capacity and stocking capacity were necessarily different on the Aztec range. The evidence reflects that while at the turn of the Twentieth Century the reservation was essentially in pristine condition, the Aztec land was already overgrazed. It was not until 1927 that deterioration of the reservation was evident. An animal grazing on the Aztec range required approximately 91 acres of land, while an animal on the reservation required only 41 acres for forage. As a result the operating costs of managing a herd on the Aztec range varied greatly from those on the reservation. Dr. Workman himself admitted under cross-examination that there was no comparability between the Aztec land and the reservation at the turn of the century. Under these circumstances it is impossible to compare the Aztec land with that of the reservation in order to assess the propriety of the grazing permit fees.

Defendant makes two arguments, sponsored by Dr. Workman, against Dr. Elliott's calculation of damages. Dr. Workman objects that the rate of 7 percent of sales, let alone 8 percent, cannot be projected reasonably over time. He reasoned that the figure does not take into account the impact that varying operating costs over time might have on the permit fees charged. Although Dr. Workman conceded that 7 percent, including operating costs, would work reasonably for one year, he testified that in a competitive bidding situation, the permittees would have calculated what they could afford, but would have found themselves locked in by the fixed 7–percent rate. He recalled that Superintendent Davis had instituted a 7–percent fee, which was used for two years before returning to a flat fee. Dr. Workman suggested that the fee was lowered in direct response to a variance in operating costs. No evidence was presented, however, to support that assertion. The court finds that Dr. Elliott's 8–percent figure is justified because it has a historical referent and is conservative. Dr. Workman did not suggest an alternative calculation or approach that would reflect more realistically the market realities over time. Dr. Elliott's theories are supported by the record.

Defendant also contends that any award to plaintiff should be reduced by the $500,-000.00 awarded in the earlier litigation as compensation to plaintiff for the amount that the reservation's rangeland would have brought in permit fees annually had it not been overgrazed. *White Mountain*

*Apache Tribe,* 11 Cl.Ct. at 666. Dr. Workman thus posits a double recovery. The court views the recovery as separate. The prior award represented damages for diminution in carrying capacity. The award in this phase represents an amount reflective of what the grazing fees should have been. It now appears that the present claim more properly should have been a component of the mismanagement phase, rather than tried as an accounting claim. However, plaintiff timely made the claim, and it was preserved for resolution at a later time.

The court finds that the BIA breached its fiduciary duty as trustee by failing to institute and monitor a rangeland permit bidding system that achieved a fair return on the leased reservation land for the benefit of the tribe. As a result the tribe was deprived of income from grazing permits secured by non-Indian permittees. The damage figure to which Dr. Elliott testified includes the year 1947, which, for the reasons explained in the opinion entered after the earlier trial, is beyond the scope of recovery. *White Mountain Apache Tribe,* 11 Cl.Ct. at 662–63. The court deducts $5,175.00 for 1947 to arrive at $644,496.00 as the amount representing the "Deficit for the Lease System," as Dr. Elliott termed it, for the period of 1905 through 1946. The court cannot award damages for Dr. Elliott's categories of "Loss in Grazing Capacity due to Mismanagement," nor "Monetary Loss due to Reduced Grazing Lease Income." The former category is precisely the mismanagement issue revisited and is beyond the scope of these proceedings. The latter category is not only speculative, but turns in large part on the same mismanagement issues litigated in the earlier trial.

## II. *Claim for stumpage*

 Plaintiff presented through its expert in Indian trust accounting, Paul J. Gillis, C.P.A., testimony on the failure of the BIA to charge adequate stumpage rates on the Unit One timber contract.[5]

Plaintiff's theory that the Government failed to demand high enough stumpage rates for tribal timber derives in large part from the 1917 sales proposal prepared by D.M. Lang, Quincy Randles, and H.H. Chapman (the "Lang proposal"). After providing its own presentation of the history of the Unit One sale, plaintiff cited two specific elements of the Lang proposal's analysis and attempted to demonstrate that, as the 22–year contract played out, these two elements, estimates of costs related to stumpage rates, were inaccurate and, thus, responsible for lowering stumpage rates at the expense of the tribe.

The first of the two elements relates to traffic on the railroad that served the timber operation. In order to transport lumber from the mill, the Lang proposal suggested that a railroad be constructed between Holbrook and McNary, Arizona. The Lang proposal estimated that non-lumber, originating traffic on the proposed 74–mile railroad would be 70.6 percent of the total traffic after service began on the line. When the railroad did become operational, the actual percentage of non-lumber, originating traffic which the railroad carried was far below what the Lang proposal predicted. It is plaintiff's theory that the BIA was responsible in great measure for the difference between the non-lumber traffic estimated by the Lang proposal and 40.8 percent, the actual percentage of non-lumber traffic. Plaintiff asserts that this difference raises the operating costs for timber production, thereby resulting in a decrease in stumpage rates. After spreading the increased costs over 40 million board feet ("MBF") per year, *see White Mountain Apache Tribe,* 11 Cl.Ct. at 669, the projected McNary production total, plaintiff asserts that total enterprise costs per MBF should be reduced by $1.66 per MBF. Plaintiff allocates all of this savings to an increase in the stumpage rate, resulting in a higher price for stumpage.

The second element of the Lang proposal addressed by plaintiff relates to a theory of capital recovery in the sawmill enterprise.

---

**5.** Mr. Gillis noted that the term "Unit One" as defined in the 1917 proposal should not be confused with the Unit One timber sale in the 1986 trial. *See White Mountain Apache Tribe,* 11 Cl.Ct. at 667–73.

Mr. Gillis opined that a writedown in capital value should have been taken when the identities of the major stockholders in the corporate buyer changed, that is, when Apache Lumber Co., Inc. ("Apache Lumber"), assigned the contract to W.M. Cady Lumber Company. Plaintiff introduced the report of Lee Muck, a Forest Evaluation Engineer, entitled Financial and Operating Characteristics of the Cady Lumber Corporation, McNary, Arizona, principally to demonstrate that new investors, W.C. Cady and James G. McNary, bought the company at $900,000.00 to $1,000,000.00 less than book value.[6] It was Mr. Muck's contention that the financial difficulties of the mill were attributable not to stumpage rates, but, rather, to the fact that the mill plant had been excessively overbuilt and depreciation costs were higher than originally anticipated in the 1917 proposal. Plaintiff seeks to capture that difference by way of a reduced depreciation charge and an increased stumpage rate. Mr. Gillis testified that he believes the depreciation charge in downstream cost estimates was too high by $.50 per MBF. Consequently, Mr. Gillis would reduce the total enterprise cost by that amount, allocating all of the difference to stumpage prices, which would result again in a higher stumpage rate for the tribe.

Under Mr. Gillis' rationale, combining the two elements—the $.50 per MBF depreciation claim and the $1.66 per MBF percent-of-railroad-traffic claim—yields a total stumpage rate increase of $2.16 per MBF. Mr. Gillis explained that he added the amount of $2.16 per MBF to the various stumpage rates set throughout the life of the Unit One contract to determine the value of plaintiff's income deprivation.

Although Mr. Gillis was a thoughtful and sincere witness, plaintiff's argument is unable to withstand scrutiny when set against the more accurate historical and economic backdrop presented by defendant. Defendant offered testimony on the stumpage claim through its own expert, Dr. Robert P. Latham, who had been qualified as an expert professional forester and resource economist in the 1986 trial. White Mountain Apache Tribe, 11 Cl.Ct. at 671. Dr. Latham testified principally on the history of the Unit One contract. He presented a comprehensive picture of the period of the contract at issue in this claim.

At the inception of the Unit One contract, Apache Lumber agreed to a fixed stumpage rate of $3.00 for the period of 1917 to 1924. Apache Lumber suffered heavy losses under the $3.00 stumpage rate. Following Apache Lumber's financial collapse, the new investors, Messrs. Cady and McNary, negotiated a buyout/assignment of the contract.

Defendant introduced a narrative history of the assignment of the Unit One contract, taken from an account by J.P. Kinney:[7]

In November 1923, Mr. W.M. Cady, who had many years of lumbering experience in southern yellow pine, and Mr. James G. McNary, who had been associated with him for some time, visited Washington, D.C. and advised the Indian Office of their negotiations to purchase the interests of the Apache Lumber Company, including the contracts for Indian Reservation and National Forest Timber. These gentlemen represented that to secure the capital for such an enterprise they must know what the price of timber was to be for approximately ten years in advance. They were unwilling to assume the obligations of a contract providing for indefinite future prices.

I felt that in return for the fixing of prices ten years in advance, the company could well afford to agree to graduated, fixed increases and recommended to the Commissioner that the price be made $3.20 for all timber cut between January 1, 1924 and December 31, 1926, $3.55 for all timber cut between January 1, 1927

---

**6.** The transaction was a sale of capital stock between stockholders rather than a sale of assets from the corporation. The book values, less the normal year-to-year depreciation, remained the same.

**7.** Mr. Kinney held the position of the Indian Office's Chief Supervisor of Forestry and was one of the participants in evaluating the propriety of the Unit One sale and contract. His narrative is therefore written in first person.

and December 31, 1929, and $4.00 for all timber cut between January 1, 1930 and December 31, 1932, with provision for a re-determination of price on January 1, 1933, January 1, 1936 and January 1, 1939 either on the basis contemplated in the original contract or on a stumpage reappraisal basis. This arrangement was accepted by Messrs. Cady and McNary and a supplemental agreement, embodying these provisions was approved by the Department of the Interior on March 10, 1924, with the assignment of the contract of the Apache Lumber Company to the W.M. Cady Lumber Company. The name of the mill town was changed to McNary and the lumber activities greatly expanded. Within two years there was a reorganization of the company and an assignment to the Cady Lumber Corporation on October 24, 1925. The venture was not successful financially and early in 1928 the company became urgent in its appeals for relief from the increased stumpage price. On April 17, 1928, the Department submitted to the Comptroller General the question of whether the price could be reduced to the original price of $3.00, it being apparent that under the terms of the original contract the purchaser would have been entitled to a stumpage price of only $3.00. In a decision of May 10, 1928, the Comptroller held that the Secretary of the Interior had no authority to depart from the terms of the supplemental contract, which had established fixed stumpage prices. Accordingly the company continued to pay $3.55 until December 31, 1929 and $4.00 per M [1000] feet from January 1, 1930 to December 31, 1932 for all timber cut from lands of the Fort Apache Indian Reservation. The company avoided the burdensome price to some extent by cutting from the Indian Reservation only the minimum amount required by

the contract and by augmenting its cut on the National Forest, where the price was only $2.50 subsequent to January 1, 1924.[8]

J.P. Kinney, Indian Forest and Range—A History of the Administration and Conservation of the Redman's Heritage (1950).

As this narrative history suggests, the new investors, Messrs. Cady and McNary, were so apprehensive about the effect of a contract reappraisal on the new mill operation that they requested a contract revision with fixed rates. After extensive negotiations those revisions were granted. Although the revised rates proved disastrously high, they remained unchanged through the end of 1932. In 1933, 16 years after the beginning of the contract and in the midst of the Great Depression, the rates became subject to BIA review. The BIA then approved a rate reduction for the remaining five years of the contract. The reduced rate, however, never dropped below the original $3.00 figure agreed to in 1917 by Apache Lumber. Even with this reduction, Cady Lumber Corporation became insolvent in 1935.

After a thorough examination of the history of the Unit One sale, the court finds that, in setting the stumpage rates on the Unit One contract, the BIA demanded and received as high a stumpage rate as was possible for the tribe on the Unit One sale. The court further finds that the modifications and the fixed step increases approved by the BIA to the Unit One contract were proper and were undertaken in the best interests of the tribe.

The Unit One buyer was faced with a fixed stumpage rate throughout most of the life of the Unit One contract and had every motivation to keep costs low, contrary to plaintiff's assertions. In general, stumpage is an economic residual that derives its value from consumer dollars less

8. Dr. Latham testified that this last figure of $2.50 was actually $4.00, but the buyer did not make the minimum contract requirement.

This narrative history of the Unit One sale and contract is but one of several presented by defendant. The other histories, a report by Warren S. Halsey, entitled Forest Management on The San Carlos and Ft. Apache Indian Reser-

vations 1872–1947 (Sept. 1, 1975), and Fort Apache Forestry: A History of Timber Management and Forest Protection on the Fort Apache Indian Reservation 1870–1985 (1990), by Arthur R. Gomez and Veronica E. Tiller, address the same series of events and are consistent with the Kinney narrative.

all costs. The Unit One contract demonstrated no bias toward the needs of the mill operator in setting the stumpage rate. The prices set in this contract, the court notes, eventually drove all mill owners into bankruptcy.

Plaintiff's wholesale reliance on the two elements of the Lang proposal is misplaced. Its rationale would ignore any market balancing of competing interests, such as alternative timber supplies in other regions, consumer demand for lumber products, or costs of production. The two elements selected by plaintiff from the Lang proposal were not the controlling elements in estimating the value of stumpage.

The historical structure of the Unit One sale, described by plaintiff, is inaccurate. If a more realistic history is taken into account, the management behavior of the Government appears reasonable. While the system was imperfect, the imperfections do not provide a basis for the damages claimed by plaintiff. There is little reason to believe that an erroneous prediction made in 1917 about the percentage of non-lumber traffic on the proposed railroad caused below-market stumpage rates in either the Unit One sale or any of the other pre–1946 sales.

Finally, plaintiff's theory of capital recovery through reduced depreciation costs is equally unworkable. Plaintiff's entire claim rests on a series of plausible suppositions, not actual occurrences (the rationale of *post hoc ergo proctor hoc*). Plaintiff has failed to prove by a preponderance of the evidence that the BIA breached its fiduciary duty by failing to secure adequate stumpage rates for tribal timber. The stumpage rates that plaintiff claims would have been fair to the tribe are unrealistic and betray a lack of understanding of the stumpage market.

III. *Claim for disposal of tribal timber without compensation to the tribe*

Defendant conceded $248,000.00 for any and all claims arising from the disposal of tribal timber to third parties without compensation to the tribe. Plaintiff agreed that this sum fully satisfies its claim and discharges defendant from liability thereon. As a consequence $33,000.00, representing an award for timber at two agency sawmills, is duplicative and will be deducted from the award in the 1986 trial. *See White Mountain Apache Tribe*, 11 Cl.Ct. at 681.

### CONCLUSION

Based on the foregoing,

IT IS ORDERED, as follows:

Plaintiff is awarded $892,496.00 on its three accounting claims other than IMPL and IIM claims.