**WHITE MOUNTAIN APACHE TRIBE OF ARIZONA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 22–H.

United States Court of Federal Claims.

Nov. 4, 1993.

As Corrected Dec. 2, 1993.

William H. Veeder, Washington, DC, for plaintiff.

Michael D. Lieder, Washington, DC, for I.S. Weissbrodt.

James M. Upton, Washington, DC, with whom was Acting Asst. Atty. Gen. Lois J. Schiffer, for defendant.

## *OPINION*

NETTESHEIM, Judge.

This matter is before the court after argument on Israel S. Weissbrodt's motion filed August 19, 1992, on behalf of the now dissolved firm of Weissbrodt & Weissbrodt (referred to collectively as the "associated attorneys"), for reimbursement of attorneys' fees and expenses. Mr. Weissbrodt, former attorney of record for the White Mountain Apache Tribe ("the Tribe"), moves pursuant to General Order No. 4, Dec. 20, 1982 (Indian Claims Commission Act of August 13, 1946, 60 Stat. 1053 § 15, *as amended*, 25 U.S.C. § 70n (1976) (omitted from Code pursuant to Commission termination on Sept. 30, 1978)), for an order awarding him 10 percent of the $14,386,470.32 judgment in favor of the Tribe entered by this court on July 21, 1992, *White Mountain Apache Tribe v. United States*, 25 Cl.Ct. 333 (1992), *aff'd*, 5 F.3d 1506 (Fed.Cir. 1993) (unpubl.), *reh'g denied* (Fed.Cir. Sept. 13, 1993), plus interest, which now totals approximately $19 million.[1] Mr. Weissbrodt also moves for reimbursement of previously unreimbursed expenses totalling $75,205.44 incurred in connection with the prosecution of the Tribe's claims.

---

1. The motion was fully briefed in 1992; the court stayed its decision until the Federal Circuit re-

## FACTS

Mr. Weissbrodt began his association with the Tribe on July 15, 1949, under a contract with the Tribe's counsel. Commencing in 1953 Mr. Weissbrodt worked directly with the Tribe under 10-year contracts approved by the Department of the Interior, up to the point of his withdrawal as attorney of record for the Tribe's claims on February 23, 1982. The last contract under which Mr. Weissbrodt worked for the Tribe contained a clause basing compensation on a contingent fee of up to 10 percent of any amount recovered for the Tribe. The full text of the clause reads:

8. It is agreed that the compensation of the ATTORNEYS for the services previously rendered and to be rendered under the terms of this CONTRACT *is to be wholly contingent* upon a recovery for the TRIBE. The ATTORNEYS shall receive such compensation as the court or tribunal awarding a recovery to or for the TRIBE shall determine to be equitably due the ATTORNEYS, or, if the matter be settled without submission to a court or tribunal resulting in a recovery to or for the TRIBE, as the Secretary of the Interior or his authorized representative may find to be equitably due the ATTORNEYS, but in no event shall the aggregate fees exceed ten percentum of any and all sums recovered or procured, through efforts, in whole or in part, for the TRIBE, whether by suit, action of any department of the Government or of the Congress of the United States, or otherwise.

Attorney Contract between the White Mountain Apache Tribe and I.S. Weissbrodt, *et al.*, June 17, 1966, ¶ 8 (emphasis in original).

Ten percent was the maximum allowed under section 15 of the Indian Claims Commission Act, 60 Stat. 1053, § 15 (formerly codified at 25 U.S.C. § 70n), which provides:

The fees of such attorney or attorneys for all services rendered in prosecuting the claim in question, whether before the Commission or otherwise, shall, unless the amount of such fees is stipulated in the approved contract between the attorney or

---

solved the Tribe's appeal of the judgment. *See* Order entered on Oct. 30, 1992, ¶ 2.

attorneys and the claimant, be fixed by the Commission at such amount as the Commission, in accordance with standards obtaining for prosecuting similar contingent claims in courts of law, finds to be adequate compensation for services rendered and results obtained, considering the contingent nature of the case, plus all reasonable expenses incurred in the prosecution of the claim; but the amount so fixed by the Commission, exclusive of reimbursements for actual expenses, shall not exceed 10 per centum of the amount recovered in any case. . . .

In October 1950, as amended on October 27, 1959, the Tribe and the San Carlos Apache Tribe of Arizona ("the San Carlos Tribe") filed a petition with the Indian Claims Commission seeking to recover for mismanagement of tribal resources and funds and for aboriginal land claims. In 1959 the aboriginal land claims were severed from the resource management and accounting claims. The land claims were eventually settled for $4,900,000.00 on September 12, 1972. Litigation continued on the remaining claims under Docket No. 22–H, which were transferred to the Court of Claims on December 15, 1976. It appears that little activity occurred during this time aside from the issuance of an accounting report by the Government in 1970 and the court-ordered revision of the same in 1975. In April 1978 the Trial Division of the Court of Claims conducted a 6–day trial on the propriety of the Government's disbursements from the Indian Moneys, Proceeds of Labor accounts through August 1946. After the trial counsel for defendant was directed to prepare a set of proposed findings of fact. During this period settlement talks ensued.

The present controversy involves an attempt to settle the claims in Docket No. 22–H and the Tribe's subsequent discharge of Mr. Weissbrodt. The settlement discussions begun by the parties in March 1980 eventually led to a proposed agreement under which the Tribe would be paid $13 million for its claims and the San Carlos Tribe $10 million.[2] The San Carlos Tribe approved the settlement, and judgment was entered in favor of the San Carlos Tribe pursuant to the settlement on January 19, 1981.

The Tribe was more hesitant about the settlement than the San Carlos Tribe. Of particular concern was the language contained in ¶ 6 of the Department of Justice's version of the settlement, which set as a condition of the settlement:

6. That the judgments entered into pursuant to this settlement shall finally dispose of all rights, claims, and demands which the plaintiffs have asserted or could have asserted against the defendant under the provisions of the Indian Claims Commission Act in Docket No. 22–H before the Court of Claims.

On October 10, 1980, tribal attorney Kathleen A. Rihr requested clarification from the Weissbrodt firm and from attorney William H. Veeder, the Tribe's Water Rights Attorney, of whether the settlement precluded the water rights and land recovery claims that the Tribe had been pursuing through Mr. Veeder.[3] At the Tribal Council meeting called to discuss the settlement negotiated by the Weissbrodt firm, several concerns were raised. Members of the Tribal Council were confused about how the Weissbrodt firm had arrived at the figure of $13 million as the settlement amount. Tribal Council Chairman Ronnie Lupe raised the concern that ¶ 6 of the settlement offer would require the Tribe to waive its rights to other claims, including water rights and land recovery claims.

---

2. At the time the settlement was presented to the Tribe for approval, it was far from a done deal. The acceptance letter dated October 28, 1980, sent by then-Assistant Attorney General James W. Moorman was subject to a number of conditions including: approval of the settlement by the governing bodies of the plaintiff tribes and the Court of Claims; approval of the settlement and the tribal resolutions by the Secretary of the Interior; and waiver of all claims that had been or could be brought by the Tribe under Docket No. 22–H.

3. Mr. Veeder eventually became counsel of record in November 1983, replacing interim counsel of record Robert C. Brauchli, who has served as General Counsel to the Tribe from 1980 through 1987; as Special Counsel from August 1987 through May 1988; and General Counsel from May 1990 to date.

These concerns, coupled with concerns about the amount of offset claims the Government may have asserted against the Tribe and the scope and basis of the settlement, caused growing discontent within the Tribe regarding the associated attorneys' handling of the Tribe's claims. By Tribal Resolution adopted on February 10, 1981, the settlement was eventually rejected on the basis that it would compromise the Tribe's other claims and that the $13 million figure was inadequate compensation for damage due to mismanagement. After this event relations between the Tribe and the associated attorneys worsened until the Tribe terminated the contract with the associated attorneys by Tribal Resolution adopted on April 1, 1981. Although the Department of Interior failed to approve the Tribe's termination of the contract for cause, the associated attorneys agreed to terminate the contract by mutual consent. On February 23, 1982, the Court of Claims granted Mr. Weissbrodt leave to withdraw as attorney of record and substituted Mr. Brauchli as his successor. On November 7, 1983, Mr. Veeder became counsel of record and pursued the litigation through two trials in the United States Claims Court up to July 21, 1992, when judgment was entered in favor of the Tribe. Throughout this period, Mr. Veeder provided his services at an hourly rate of $80.00. At present Mr. Veeder continues as the Tribe's counsel of record.

Pursuant to an order entered on April 28, 1983, Mr. Weissbrodt filed a memorandum on May 27, 1983, informing this court of his intention to claim attorneys' fees out of any possible award to the Tribe. Following the Tribe's response to Mr. Weissbrodt's subsequent motion for attorneys' fees filed on August 19, 1992, and defendant's motion to stay proceedings on the motion pending appellate review of the judgment entered on the merits, this court issued an order on September 24, 1992, asking the parties to respond to the motion to stay. After briefing, an order entered on September 30, 1992, delaying resolution of the motion pending receipt of Mr. Weissbrodt's reply brief to the Tribe's response. *See supra* note 1. The order indicated that if a percentage-based fee award was used, an accurate determination of the fee amount could not be made until after appellate review of the final award to the Tribe. A determination regarding the stay therefore was made contingent on a finding by the court of whether a percentage or a fixed-sum award was appropriate for the fee award.

On October 30, 1992, the court issued an order stating that "[a]fter extensive review of the applications for fees and expenses, the court concludes that a fixed amount should be awarded...." The court also reconsidered its prior order and granted the stay pending appellate review because "a reasonable award cannot be made without knowing with certainty the amount of the ultimate award and the types of interest that will be allowed thereon...." *Id.* The order further provided that a decision on the motion for fees and expenses would follow promptly after the Federal Circuit decision was rendered. The appeals court affirmed the final judgment on August 13, 1993. *White Mountain Apache Tribe v. United States,* 5 F.3d 1506 (Fed.Cir.1993) (unpubl.), *reh'g denied* (Fed.Cir. Sept. 13, 1993).

The parties have been aware since September 30, 1992, that the court was considering an award of a fixed amount. Indeed, prior to that order, the associated attorneys had briefed their motion with information relating to approximately 5,000 hours actually worked. During argument on October 15, 1993, the court discussed with the parties an award based on an hourly rate for the attorney hours expended as a measure of the reasonableness of the award. Mr. Weissbrodt filed a motion on October 25, 1993, for leave to supplement the record to include additional evidence concerning the number of hours expended, the nature of work performed, and a reasonable hourly rate. This motion was granted. In response plaintiff filed a motion to preclude reliance upon affidavits to supplement the record or, alternatively, to provide the Tribe with records supporting the total hours claimed, as well as the hours that were the subject of the associated attorneys' original motion. The affidavits in question support the associated attorneys' claim that a $200–$250.00 per hour fee is reasonable for the associated attorneys' work

by present-day standards, and two affidavits purport to justify some 9,000 hours. Because resolution of the associated attorneys' motion does not require use of present-date fee rates, *see* discussion *infra* at 20–21, it is unnecessary to preclude reliance on these affidavits. Insofar as the affidavits address hours worked, the associated attorneys have no excuse for attempting to submit evidence to augment the number of hours at this late date. The Tribe's motion was therefore denied.

## DISCUSSION

■ Mr. Weissbrodt styled his motion for attorneys' fees and expenses as a motion for summary judgment. A fee application is not meant to be a time-consuming trial-type proceeding. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Rather, it is a summary proceeding by which the court determines a fee that is reasonable for the work performed. Mr. Weissbrodt, however, is misguided in relying on summary judgment standards to support his motion since the standards of RCFC 56 are inapplicable to fee applications. Most fee applications are challenged, with disputed facts resolved based on the record. Although the number and disputatiousness of factual thrusts and parries in the matter may be of singular record, the record provides sufficient material and relevant information to determine the amount of an appropriate award.

### I. *Attorneys' fees*

There is a notable paucity of case law regarding the award of attorneys' fees in situations such as the one at hand. Few Indian claims have been brought in the last 25 years, and those that have did not involve significant disputes regarding attorneys' fees. In prior cases wherein attorneys' fees were at issue, the fee awarded has consistently been at or near the statutory maximum of 10 percent of the final award. *See Western Shoshone Identifiable Group v. United States,* 228 Ct.Cl. 26, 39, 652 F.2d 41, 49 (1981). The present case is unique, however, because it involves a motion for fees made by attorneys who were not involved in the litigation resulting in the final award and whose last contract with the plaintiff Tribe ended 10 years before the final award was made. As such, this matter is essentially one of first impression.

### A. *Factors considered in determining the reasonableness of award*

In *Western Shoshone* the Court of Claims adopted the factors considered in *Cherokee Nation v. United States,* 174 Ct.Cl. 131, 355 F.2d 945 (1966), for determining the reasonableness of an attorneys' fee award:

1) The nature of the undertaking and the character of the services required

2) The responsibility assumed

3) The professional repute, standing, ability, and experience of counsel

4) The services rendered, including the time and labor required

5) The magnitude and importance of the cases

6) The novelty and difficulty of the questions involved

7) The opposition encountered

8) The results accomplished and the benefits flowing to the clients

9) The professional competence displayed, including skill, industry, and diligence

10) The fidelity of counsel to the interests of their clients.

11) The contingent nature of the employment and the hazards and risks involved

12) The loss of income and opportunities for other employment due to employment of counsel in the litigation for which compensation is to be awarded

13) Customary charges and going rates of attorneys for similar services

228 Ct.Cl. at 37, 652 F.2d at 49 (citing *Cherokee Nation,* 174 Ct.Cl. at 146–47, 355 F.2d at 953–54). The associated attorneys have cited the *Western Shoshone* criteria as the appropriate test for the reasonableness of their fee request. In justifying the 10–percent award requested, the associated attorneys rely presumptively on the results that they obtained for the Tribe, *i.e.,* the proposed settlement; the well-established custom of awarding attorneys 10 percent of the final award; the

risks involved in the litigation; and their loyalty to the Tribe. Taken together these factors do justify compensating the associated attorneys for their services, but not to the extent of the full 10 percent of the final award.

## 1. *The results obtained*

■ The associated attorneys argue that the $13 million proposed settlement negotiated by them in October 1980 "provides the measure of the associated attorneys' results." Assoc. Attys' Br. filed Aug. 19, 1992, at 11. The associated attorneys compare the settlement amount with the $14,386,545.32 award eventually obtained in 1992 and claim that even with conservative investment, the present value of the 1982 settlement would far exceed the 1992 value of the litigated award. This argument rests on the invalid assumption that the two are comparable since the settlement proceeds would not have been held for 10 years.

■ With hindsight, litigation decisions often take on a different light. But it is quite unreasonable to condemn a decision once the factfinder is gifted with the knowledge the passage of time allows. In 1982 the Tribe could not have known what the result of pursuing the litigation would be. Based on its own wishes and the advice of counsel, the Tribe made the decision to reject the settlement and litigate the claims. The decision to accept or reject a settlement offer rests solely with the client, not with the attorney who negotiates it. *United States v. Int'l Bhd. of Teamsters*, 986 F.2d 15, 19 (2d Cir.1993) (citing *United States v. Beebe*, 180 U.S. 343, 350–53, 21 S.Ct. 371, 374–75, 45 L.Ed. 563 (1901)).

The record demonstrates that the Tribal Council carefully considered the settlement, but could not reconcile the questions that it had regarding waiver of the water and land claims and the basis for the $13 million settlement figure. Several requests were made to the associated attorneys to address these concerns, but the Tribe eventually concluded that these concerns warranted rejecting the certainty of the settlement. This court cannot presume the decision of the Tribe to reject the settlement offer was unreasonable,

especially since the Tribe eventually recovered a substantial sum. Although the associated attorneys have made allegations that the Tribe was unduly influenced by Mr. Veeder, they have introduced no evidence to indicate that the Tribe's decision was irrational or the product of undue influence. Evidence to the contrary abounds. Absent significant evidence of fraud or mutual mistake, this court is unwilling and unable to question the validity of the Tribe's decision. *Cf. Cheyenne–Arapaho Tribes of Indians v. United States*, 229 Ct.Cl. 434, 442–43, 671 F.2d 1305, 1311 (1982) (citing *Callen v. Pennsylvania R.R. Co.*, 332 U.S. 625, 630, 68 S.Ct. 296, 298, 92 L.Ed. 242 (1948)) (settlement can only be challenged by showing that it "is tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted").

The result obtained by the associated attorneys was a settlement that was not acceptable to the Tribe. A rejected settlement, no matter how attractive it appears with hindsight, cannot reasonably be termed a "result accomplished" that justifies a 10–percent fee from an award obtained through totally separate litigation. The result obtained by the associated attorneys for the Tribe was essentially nil. The true "result accomplished and the benefit[ ] flowing to the client[ ]" was the final award. The associated attorneys are entitled to compensation only to the extent that their efforts contributed to achieving this award.

The work performed by the associated attorneys in pursuing the Tribe's claim in the initial stages was beneficial to the Tribe. By pursuing the claims before the Indian Claims Commission, the associated attorneys began the process that eventually resulted in a favorable award to the Tribe. The court does not question the assertion that the services performed provided some benefit to the Tribe. Rather, the record belies the associated attorneys' assertion that the value of these services should be measured using either the proposed settlement or the final award as lodestars.

Based on the record and the court's first-hand knowledge of the trials, it is clear that the research performed by the associated

attorneys was not used in obtaining the final judgment. The research undertaken for the settlement was never turned over to the Tribe. *See* Affidavit of Robert C. Brauchli dated Sept. 14, 1992, ¶¶ 38–39, 59. Although Mr. Weissbrodt claims that his firm amassed over 100 cubic feet of documents in preparation for litigation, the witnesses in the resource and accounting phases of litigation relied on the products of their own research.

The associated attorneys contend that their work was instrumental in obtaining the 1975 GSA Indian Trust Accounting Division, Office of Finance Disbursement Account Report that formed the basis of the 6–day 1978 trial on certain fiscal claims and that they filed numerous exceptions to the 1975 GSA Report. The court understands that this 1978 trial involved the Government's proof to substantiate the reasonableness of its accounting. The court acknowledges this work in its calculation of the award due on the motion for fees. However, the 3–week 1991–1992 trial on all accounting issues was *de novo* (*see* order entered on July 31, 1990); expanded in scope; and did not utilize anything from the prior effort, other than the 1975 GSA Report which, itself was supplemented in the long period during which the Tribe's fiscal claims were developed and litigated before this court. *See White Mountain Apache Tribe v. United States*, 4 Cl.Ct. 586 (1984) (interim order on fiscal claims). Paul J. Gillis, the Tribe's expert on fiscal claims, prepared the exceptions to the 1975 GSA Report that were the basis for trial in 1991–1992. In addition, since the earlier trial was limited to determining the sufficiency of the Government's accounting, the vast majority of the evidence was submitted by de-

fendant, not the Tribe. Under these circumstances the court is justified in substantially limiting the award due the associated attorneys. *See Red Lake and Pembina Bands v. Turtle Mountain Band of Chippewa Indians*, 173 Ct.Cl. 928, 937–38, 355 F.2d 936, 938 (1965) (finding that although claimant attorneys did "perform certain legal services in connection with the Commission's final award," this work did not contribute to the attainment of the final award and did not justify an award of attorneys' fees).

2. *The customary fee charged by Indian claims attorneys*

■ The contract under which the associated attorneys performed their work provided for a contingent, not a fixed fee. There was never a guarantee that they would be paid. The attorney contract explicitly stated that payment to the associated attorneys was to be "*wholly contingent* upon a recovery for the TRIBE.*" Attorney Contract between the White Mountain Apache Tribe and I.S. Weissbrodt, *et al.*, June 17, 1966, at ¶ 8 (emphasis in original) ("Attorney Contract"). Because the contract was contingent, the associated attorneys were aware that there was a chance that they would receive nothing for their efforts.

The associated attorneys correctly state that the Court of Claims traditionally awarded the full 10–percent fee in Indian claims cases. In almost all the cases cited as support for this contention, however, the attorneys receiving the 10–percent fee were also the attorneys who pursued the litigation up to and through the final award.[4] A close

---

4. In *Western Shoshone*, 228 Ct.Cl. at 41, 652 F.2d at 50, the attorneys carried their clients' claim through 49 years of litigation, including resolution of unfavorable precedent, resisting offsetting claims, and valuation of land claims. The attorneys were discharged just four months before the Indian Claims Commission finally issued a $26,-145,189.89 award. All the work leading up to the award except the final oral argument had been performed by the initial attorneys, however. In *Gila River Pima–Maricopa Indian Community v. United States*, 8 Cl.Ct. 569, 571 (1985), the attorneys brought their client's claim through two trials and three appeals using "extensive and novel efforts in discovery, organization and presentation." Even in the case involving the San

Carlos Tribe settlement, the associated attorneys were the attorneys of record at the time a favorable award was obtained.

Uniformly, the 10–percent fee has been awarded only to the attorneys who actually brought the client's claim to final judgment. *See Sioux Nation of Indians v. United States*, 227 Ct.Cl. 404, 650 F.2d 244 (1981) (attorneys successfully lobbied Congress to pass law excluding offset claims against clients, overcame 2 prior adverse decisions and won the largest award in tribunal's history—$105,994,430.52); *Turtle Mountain Band of Chippewa Indians*, 225 Ct.Cl. 746, 748, 1980 WL 13212 (1980) (attorneys established title and boundaries to land, determined favorable time of taking, and prevailed on two appeals over

16

examination of these cases shows that the Court of Claims intended the 10–percent fee as compensation for attorneys who succeeded in prosecuting a case to a final award for their clients. The 10–percent contingent fee was meant as payment for a "result achieved" for the client, not an automatic guaranteed payment for all work done. The associated attorneys have not cited, and this court is unaware of any cases, in which the full 10–percent fee was awarded to attorneys who did not participate in bringing the claim to final judgment.

The associated attorneys now ask this court to compel the Tribe to remit 10 percent of its judgment to attorneys who did not participate in the suit that eventually yielded the award, even though the Tribe has already paid the attorney that prosecuted the case. Not unreasonably, the associated attorneys point out that the congressionally mandated 10–percent award is less than customary contingent fee contracts. Congress presumably selected the 10–percent figure in recognition of both the magnitude of awards in Indian Claims Commission cases and the years of litigation effort necessary to achieve an award. Therefore, it can be argued that a 10–percent award is *ipso facto* reasonable since, being a departure from the norm and favoring the Indians, it represents Congress' assessment of the extent to which Indian claims attorneys should be compensated in the circumstances. Hence, the associated attorneys argue that Mr. Veeder has been compensated with an annual fee per his contract with the Tribe, but they have not.

The difficulty with this approach is that it would transmute the congressionally-approved maximum into a mandated award, whereas Congress specifically reserved to the court the determination of a reasonable fee. Regardless of the favorable nature of the proposed settlement that the associated attorneys negotiated years before, this court

does not find 10 percent of the final award to be equitable compensation as envisioned by the contract. The associated attorneys are entitled to compensation, but not an amount equal to that traditionally awarded to attorneys who have played a much greater role in obtaining a final award.

### 3. *The risks involved*

■ The associated attorneys assert that there was a substantial risk of non-recovery when they decided to take on the Tribe's case in 1950. Many issues pivotal to success on the merits were unresolved when the action was first started. Because the associated attorneys could not be confident of a fee commensurate with the hours devoted to the case, they argue that a 10–percent fee is appropriate.

Risk does have significance in fee analysis, but its significance is substantially diminished in the present case due to the lack of involvement of the associated attorneys in the litigation of the Tribe's claims. Once the associated attorneys decided not to pursue litigation, but instead negotiated a settlement, the risk to them was substantially reduced. Considering, in addition, the other factors surrounding this case, the risks involved take on a relatively minor importance in determining the associated attorneys' fees. The risk in settling the case was certainly much less than the risk of carrying the case to trial.

### 4. *Loyalty to the interests of the Tribe*

■ The discharge of the associated attorneys was marred with accusations of malpractice and incompetence made by both Mr. Weissbrodt's firm and Mr. Veeder. The allegations and attacks launched by each side have bordered on the hysterical at points and have impaired, rather than facilitated, a reasoned resolution to this dispute.

37 years of litigation); *Citizen Band of Pottawatomie Indians,* 221 Ct.Cl. 847, 848, 618 F.2d 122, 123 (1979) (17–page docket showed "virtually an unbroken sequence of activity in this case since its original filing in 1950," including 2 appeals leading up to $4,497,815.59 final award); *Kickapoo Tribe of Kansas,* 220 Ct.Cl. 687, 618 F.2d 122 (1979) (case required 27 years, and numerous trials involving conflicting claims, to result in a

$11,427,130.00 final judgment); *Creek Nation,* 220 Ct.Cl. 620, 618 F.2d 121 (1979) (attorney began researching tribe's claim in 1930, was involved in creation of Indian Claims Commission, and spent 27 years litigating claim). While the associated attorneys' efforts are worthy of compensation, they pale in comparison to the efforts that have previously warranted a 10–percent contingency fee.

Given the appreciable sum negotiated by the associated attorneys and the findings of the Secretary of the Interior regarding the Weissbrodt firm's performance as counsel, it is unnecessary to pursue the issue of malpractice and breach of loyalty any further. These allegations are insufficiently founded to have an effect on the amount due the associated attorneys. When this factor is viewed in light of other considerations, especially the degree to which the associated attorneys' work assisted in obtaining the final judgment, the other factors overshadow the poorly developed and openly bellicose accusations leveled by both sides.

### 5. *Other considerations*

■ The associated attorneys maintain that other factors, including the extensive scope of the Tribe's claims, the skill of the attorneys, the excellent result obtained in the proposed settlement, and the opposition encountered, support a 10–percent fee. To lend support to their claim, they have submitted documentation of the hours the firm devoted to the Tribe's claim and a summary of other awards obtained by their firm for other Indian clients.

In support of their motion, the associated attorneys submitted 56 pages summarizing the amount of time devoted to the Tribe's claim between 1969 and 1982. These submissions, however, cause concern due to the lack of specificity regarding the nature of the work and the client for whom the work was done. The sheets submitted contain only the number of hours worked and do not provide any sort of description of the work performed. The court has no basis for determining whether the amounts claimed are properly allocable to the Tribe. *Cf. Naporano Iron & Metal Co. v. United States*, 825 F.2d 403 (Fed.Cir.1987) (under Equal Access to Justice Act contemporaneous records of time and usual rates necessary to determine reasonableness of charges).

In addition, the billing sheets do not clearly define the work devoted to the Tribe. Instead, the sheets distribute the hours worked between three clients: White Mountain Apache Tribe, Western Apache Tribe, and San Carlos Apache Tribe. The associat-

ed attorneys contend that the settlement for the Tribe had the same basis as that of a neighboring and related Western Apache Tribe—the San Carlos Apache Tribe. Thus, much of the work done was allocated equally between the San Carlos Tribe and plaintiff Tribe. From 1969–1982 the associated attorneys claim 385 hours allocable to plaintiff Tribe, 267.25 hours allocable to the San Carlos Tribe, and 9,218 hours divided equally between the two tribes. The total devoted to plaintiff Tribe would be half of the joint total (4,609 hours), plus the amount directly completed for the plaintiff Tribe (385 hours), yielding 4,994 hours.

The court is mindful of one overriding fact that distinguishes this case from the customary motion for fees in Indian claims cases. The associated attorneys rendered their services with the expectation that they would receive a percentage of the recovery, if any. However, the precedent dealing with fee shifting developed during the 1980's, largely under the aegis of the Equal Access to Justice Act, Pub.L. No. 96–481, 94 Stat. 2328 (codified at 28 U.S.C. § 2412(d) (1988)) (the "EAJA"). Although the Tribe insists that the associated attorneys should take nothing because their records do not show time spent on work and tasks performed for the Tribe, it would be unfair to find the associated attorneys' recordkeeping fatally defective on the basis of current standards.

The associated attorneys ask the court to take the other extreme by awarding the flat 10–percent figure. They hypothesize that had the Tribe accepted the $13 million settlement in 1980, the Tribe would be in a better position than receiving an award in 1993 of $19 million. As discussed earlier, this scenario assumes that one is comparing $13 million banked in 1980 with the 1993 judgment. The comparison is invalid since it assumes the Tribe would have banked all the proceeds. In fact, the Tribe recovered substantially more in 1992 than the settlement as a result of having litigated its claims. More importantly to the Tribe, it now has the satisfaction of knowing what its claims were worth, which, according to the Tribal Resolution adopted April 1, 1981, was a principal

reason why the Tribe rejected the proposed settlement.

The associated attorneys also hypothesize that the Court of Claims would have awarded the 10 percent had the Tribe accepted the settlement and the matter been concluded in 1981. The associated attorneys therefore question why the situation should be any different now, especially since their contract is still valid and no other attorney seeks to participate in the award. The long answer is that a great deal of litigative and jurisprudential history ensued during the last decade. Were this a case wherein a firm was terminated incident to trial or settlement, the associated attorneys' claim would have some ethical appeal. In this case the entire resource and fiscal claims were developed and tried after the associated attorneys were no longer associated with the Tribe. A hypothetical more fitting to the facts of the instant case would have the Tribe rejecting the settlement in 1981 and then abandoning the claims without recovering anything. In such a case, the associated attorneys could not expect payment for their services. *Cf. Knight v. United States*, 982 F.2d 1573, 1584 (Fed.Cir.1993) (attorneys seeking 25–percent contingency fee were not entitled to a fee when court of appeals decision left no basis for plaintiff's recovery).

In short, the associated attorneys either fail or refuse to grasp the significance of their total non-involvement in the case during the 10 years leading up to the final award. This 10–year absence is the keystone to any analysis of the associated attorneys' claim. Any award that did not account for this long period of inactivity would be inequitable. If the associated attorneys had litigated the case to its conclusion, little question would exist that they would be entitled to the full 10–percent fee. They did not, however. Awarding a fee to the associated attorneys based on an result obtained by another attorney who has already been compensated would not only be incomprehensible, it would be wrong. A contingency fee is meant to be a merit-based form of compensation. It is not the guaranteed windfall that the associated attorneys appear to think it is.

### B. *Determination of adjusted fee that associated attorneys are due*

#### 1. *Authority of the court to determine fee*

■ This court has authority under both the Indian Claims Commission Act and the attorney contract between the associated attorneys and the Tribe to determine an adequate fee for services rendered to the Tribe. 60 Stat. 1053, § 15, Attorney Contract ¶ 8. The court must use its sound discretion in fixing an adequate fee, taking into consideration the factors enumerated in *Western Shoshone*. In addition, when more than one attorney has represented a claimant under separate contracts, the court must "determine whether any of the attorneys of record [are] entitled to compensation for [their] services in prosecuting the claim." *Pottawatomie Tribe v. United States*, 227 Ct.Cl. 739, 741, 1981 WL 21428 (1981). Once the court makes the determination of entitlement, " 'their fees will be apportioned on the entry of judgment in proportion to the value of their services to claimants.' " *Sisseton and Wahpeton Bands or Tribes v. United States*, 191 Ct.Cl. 459, 469, 423 F.2d 1386, 1391 (1970) (quoting *Beddo v. United States*, 28 Ct.Cl. 69, 76, 1800 WL 1897 (1893)).

■ Because the associated attorneys did not take part in the litigation of the suit that led to the final award of damages, it is inappropriate to use this award as the measure of value of the associated attorneys' services. This award reflects Mr. Veeder's work and does not reflect the work done by the associated attorneys.[5] No one is in a better posi-

---

5. The court notes that the associated attorneys fault Mr. Veeder's conduct of the litigation and point to instances where Mr. Veeder's advocacy has been taken to task by other courts. This court has presided over the *White Mountain* case since its assignment on January 25, 1983, with Mr. Veeder as counsel of record during all but 9½ months. For nine years during the litigation of its claims, the court has acquired total familiarity with the legal effort on the Tribe's behalf. The associated attorneys left no fingerprints on the case that eventually was passed on to Mr. Veeder. The 1978 trial record on certain fiscal claims was unusable, and this court tried the Tribe's fiscal claims in full. Mr. Veeder may be difficult and trying to the court's patience, but he has served as an absolutely dedicated advocate

tion to pass on the relative capabilities of the associated attorneys and Mr. Veeder than this court, whose final task after years of arduous litigation is to assure that justice is done in a case of this magnitude and complexity. *See Godfroy v. United States,* 199 Ct.Cl. 487, 496, 467 F.2d 909, 914 (1972) (Indian Claims Commission was in "the best position to decide the contribution of each group of lawyers" in fee litigation). Justice would be disserved if this court were required administratively to discharge 10 percent of the Tribe's hard-won judgment to the associated attorneys based on the showing that has been put forward on their behalf. Since no sum exists that actually inured to the benefit of the Tribe from which a percentage fee can be calculated, compensation is most appropriately awarded using a fixed fee. In determining the reasonableness of this figure, an hourly rate calculation gives the most accurate analysis of this award.

The court recognizes that the Court of Claims explicitly rejected use of the "lodestar" method in *Western Shoshone Identifiable Group,* 228 Ct.Cl. at 39, 652 F.2d at 49. The fixed fee the court has chosen was not derived using the lodestar method. Rather, this method serves as a useful and accurate means of assessing the reasonableness of a fixed fee.[6] *See Rosquist v. Soo Line R.R.,* 692 F.2d 1107, 1114 (7th Cir.1982) (trial court's comparison of attorneys' potential hourly award to customary contingency percentages and fixed fee rates was proper). At any rate, this case is easily distinguishable from *Western Shoshone.* Unlike that case and the cases cited therein, this case involves

attorneys who were neither under a contract at the time of the final judgment nor involved in any way in the litigation leading to the final judgment. The court in *Western Shoshone* relied on the statutory framework governing Indian claims cases in rejecting the lodestar method, citing the statute's consideration of "services rendered and results obtained, considering the contingent nature of the case." 228 Ct.Cl. at 39, 652 F.2d at 49. The petitioning attorneys in that case had "accomplished remarkable results for their clients." 228 Ct.Cl. at 40, 652 F.2d at 49. Unlike the associated attorneys, the attorneys in *Western Shoshone* had taken the case from its inception through numerous trials on different issues over a 30-year period and were discharged a mere 3 months before oral argument and 4 months before the Commission issued its final judgment in favor of the Western Shoshones. 228 Ct.Cl. at 34, 652 F.2d at 46. The *Western Shoshone* court thus had little difficulty assessing the benefit flowing to the claimant tribe from the attorneys' work.

In the instant case, it is difficult to assess what, if any, work performed by the associated attorneys contributed to the final judgment for the Tribe. In all other cases reviewed by this court, the petitioning attorneys made a substantial, quantifiable, and easily identifiable contribution to their client's recovery. In contrast, the services rendered and the results obtained by the associated attorneys in this case are insufficiently established to justify using a contingent fee calculation. Using a contingency analysis would result in a valuation of the

on the Tribe's behalf, and the Tribe has been fortunate to have his counsel.

The associated attorneys portray themselves as venerable Indian claims attorneys. The Weissbrodt firm is a long-established Washington, DC specialist and is highly regarded within the Indian claims legal community. The court has credited the associated attorneys' expertise, but this is just one factor to be taken into consideration under *Western Shoshone* and, as the associated attorneys themselves acknowledged during oral argument, is not one of the three most important factors to be considered in their view (loyalty to the interests of the Tribe, risks involved, and customary fees charged). The Court of Claims in *Western Shoshone* stated that section 15 emphasizes the results obtained and the contingent

nature of Indian claims. 228 Ct.Cl. at 41, 652 F.2d at 51. In light of the discussion of the other factors, legal expertise certainly is not determinative.

6. Although the court tests the reasonableness of its award against the number of hours worked, were the associated attorneys to reopen the record to adduce support for more than approximately 5,000 hours that they documented in their original motion, the Tribe would have the right to demand support for all hours worked, and the proceeding would rocket out of orbit. Both parties had ample opportunity to brief the matter in 1992. Moreover, the hours would merely provide a test for reasonableness; the fixed award stands alone as reasonable.

associated attorneys' work that is based not on their work, but on Mr. Veeder's. Such a result was not contemplated by *Western Shoshone* and should not apply here.

In lieu of a fixed fee based on an hourly-rate calculation, the judicially "safer" way of determining the fee would be to resort to a percentage based calculation. While such a calculation is feasible, it would be inherently inaccurate and, in the view of the court, dishonest. Using a percentage calculation, the associated attorneys would only be entitled to a share of the 10–percent of the contingency that represented their proportional contribution to achieving the final award. In *Godfroy* the Court of Claims upheld a Claims Commission decision allocating 30 percent of the final award to co-counsel because the efforts of lead counsel far outweighed co-counsel's efforts. 199 Ct.Cl. at 495, 467 F.2d at 913.

Even so, resort to either the final award or the settlement as the basis for calculating a percentage fee would yield a woefully unsatisfactory result. Using a percentage of the final award would focus on results obtained by a different lawyer and to which the associated attorneys' efforts contributed only marginally. The percentage to which the associated attorneys would be entitled would be commensurately small. Given the earlier determination by this court that the work product of the associated attorneys was virtually useless, an award of slightly more than one percent, and not a full 10 percent, is the maximum this court could justify awarding. Such a fee would imply that 10 percent of the work performed for the final award was performed by the associated attorneys.[7] Even with this generous, but quite insupportable and speculative amount, the resulting fee would be less than the $200,000.00 this court deems is appropriate as a fixed fee. Alternatively, if the proposed settlement negotiated by the associated attorneys is used as the

base amount, the court would take into account the value of the settlement to the Tribe in calculating the percentage fee. As stated before, this settlement was rejected and this court may not second-guess the Tribe's reasons for doing so. The rejected settlement had little, if any, value to the Tribe. Again, a generous and unavoidably speculative fee of one percent[8] could be used to calculate the fee, resulting in an even smaller amount.

In short, using a percentage-based calculation can only result in an arbitrary, speculative, and disingenuous valuation of the associated attorneys' work. *Western Shoshone* did not contemplate a situation such as the one at hand, and to follow the letter of this case merely because it did not anticipate the present dispute would amount to judicial sloth. The case at hand is glaringly different from the situation in *Western Shoshone* and every other case that this court has reviewed.

### 2. *Reasonableness of the fixed fee*

■ The 10–percent attorneys' fee provision of the Indian Claims Commission Act was meant to be an absolute limit on the compensation to be paid for " 'all services rendered in prosecuting the claim in question,' not merely to the fee of the particular counsel whose claim is being adjudicated." *Sisseton and Wahpeton Bands or Tribes v. United States,* 191 Ct.Cl. 459, 465, 423 F.2d 1386, 1389 (1970). While the amount that Mr. Veeder has been paid does not of necessity determine the exact amount to which the associated attorneys are entitled, it does emphasize the unreasonableness of a claim to the full 10 percent. As a starting point, since Mr. Veeder has been paid for his services, the associated attorneys cannot be entitled to the full 10–percent fee.

■ The court is further concerned both with the inability of the associated attorneys to identify in the time sheets submitted what work was being performed by the

---

7. A 10–percent contingency award would yield a sum of $1,438,647.03. If the associated attorneys had performed 10 percent of the work in the case, they would be entitled to 10 percent of this sum, or $143,864.70.

8. This would be equivalent to 10 percent of the amount traditionally awarded to attorneys who

litigate a case to its conclusion and actually obtain a tangible, monetary benefit for their client. Again, using the method the associated attorneys suggest, this award would be made even though the Tribe received nothing from the proposed settlement.

attorneys and for whom. The claim that work performed by attorneys benefited the tribes equally is not *per se* invalid. *See Red Lake and Pembina Bands,* 173 Ct.Cl. at 937, 355 F.2d at 941. Rather, it is the claim by the associated attorneys that the work was equally apportioned between the two tribes that raises concerns.[9] Uncertainty arising from imprecise recordkeeping are to be resolved against claimant attorneys. *International Travel Arrangers, Inc. v. Western Airlines,* 623 F.2d 1255, 1278 (8th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980). Although the court declines to hold the associated attorneys to recordkeeping standards developed in the 1980's, some adjustment must be made for the lack of any meaningful attorney billing records. The court therefore deems it appropriate to discount by 15 percent the 4,609 hours claimed as allocable to the Tribe, but billed as equally split between the two tribes to compensate for the lack of specificity. This yields 3,917.7 hours. Both this amount and the amount directly allocated to the Tribe (385 hours) should be discounted another 15 percent for inability to explain what work was performed. This leaves 3,657.3 hours properly allocable to the Tribe.

▮▮▮▮ If the court were to award the full 10 percent fee ($1,438,654.53), this would result in an hourly rate of $393.36 for the 3,657.3 hours allocable to the Tribe. Even if the unadjusted amount claimed is used, this yields an hourly rate of $289.12. Such fees are unusually high in 1993 and would have been quite unusual in the period from 1949–1982 during which the work claimed was actually performed.[10] This court may use its discretion to adjust the number of hours requested in attorney fee petitions. *Saxton v. Secretary of DHHS,* 3 F.3d 1517, 1521 (Fed.Cir.1993).

Due to the difficulty in assessing how much and what type of work was actually performed by the associated attorneys and the period when the work was performed, as well as the intangible benefits flowing to the Tribe from the associated attorneys' work, the court finds that a flat fee of $200,000.00 is appropriate compensation for the work performed. This sum would amount to an hourly rate of roughly $55.00 for the associated attorneys' time—an amount that more realistically reflects the rate of compensation during the period of 1949 to 1982 for Indian claims cases than the statutory limit of $75.00 per hour later imposed by the EAJA. 28 U.S.C. § 2412(d)(2)(A) (1988), *as amended by* Act of Aug. 5, 1985, Pub.L. 99–80 §§ 2, 6, 99 Stat. 184, 186 (1988).

The court finds a $55.00 hourly rate reasonable and appropriate for the duration of the services performed—1949–1982. Although this rate is substantially below the $200–$300.00 rate suggested by the associated attorneys in their supplemental brief, it is reasonable under the circumstances of the case. The plaintiff from whom the associated attorneys seek payment is an impoverished Indian tribe. In the interest of justice, the impoverished state of the Tribe should be taken into account in fixing an appropriate fee.

In 1973 the United States District Court for the District of Columbia approved an attorneys' fee award in an Indian claim case based on a rate of $30.00 per hour. While the court referred to this as a "bedrock minimum" for compensation, it provides a useful, and unusually rare, point of comparison for awards involving Indian claims at this time. *Pyramid Lake Paiute Tribe of Indians v. Morton,* 360 F.Supp. 669, 672 (D.D.C. 1973), *rev'd on other grounds,* 499 F.2d 1095 (D.C.Cir.1974), *cert. denied,* 420 U.S. 962, 95

**9.** The only evidence submitted by the parties that could form a basis for evaluating the relative worth of the services to the San Carlos Tribe and plaintiff Tribe is the proposed settlements negotiated by the associated attorneys. The $13 million settlement negotiated for the Tribe was 30-percent greater than the $10 million dollar settlement negotiated for the San Carlos Tribe. This suggests that the associated attorneys' services were at least that much more valuable to the Tribe. Although the court is unwilling to use the negotiated settlements as a basis for valuing the associated attorneys' efforts, reference to the settlements shows that the associated attorneys themselves did not apportion equal worth to their work.

**10.** The court notes that the majority of the hours—3592.75 or 72 percent of the hours claimed—were worked between 1973 and 1978.

S.Ct. 1351, 43 L.Ed.2d 439 (1975). The court based its finding on the impoverished nature of the plaintiff, the significant harm to the Tribe caused by the Government, the intransigent action of defense counsel, and the enhancement of public interests accomplished by the suit. Similar factors present in the case at bar support the reasonableness of the $200,000.00 flat fee.

The associated attorneys submit that the court should calculate the appropriate fee using the customary hourly rate charged for similar work in 1993. Citing *Catlett v. Missouri Highway & Transp. Comm'n*, 828 F.2d 1260, 1271 (8th Cir.1987), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1574, 99 L.Ed.2d 889 (1988), the associated attorneys argue that the delay in receipt of fee payment so dilutes the award as to make it unreasonable. Under *Missouri v. Jenkins*, 491 U.S. 274, 278–84, 109 S.Ct. 2463, 2466–69, 105 L.Ed.2d 229 (1989), a court may adjust for such dilution by basing the fee award on current rates or by determining the present value of the award.

Before a court adjusts a fee, however, it must determine that the delay in payment makes the fee unfair. Such a situation does not exist in the present case. Again, the absence of the associated attorneys from the 9 years of active litigation leading up to the award is crucial to the analysis. The delay in payment of the fee award was not caused by an intractable client; it occurred because the associated attorneys were discharged and another attorney undertook to prosecute the Tribe's claims from beginning to end without any contribution from the associated attorneys. The Tribe was essentially forced to start over with its claims.

This court is not the proper forum to determine whether or not the discharge of the associated attorneys by the Tribe was justified. The court merely acknowledges that it occurred; the record provides no basis for an inference that the discharge wrongfully prejudiced the associated attorneys. Absent such a showing, the delay cannot be viewed as unfair. Were this court to use the present rates suggested by the associated attorneys, it would result in an unearned windfall to them and an unjustifiable penalty

to the Tribe. No adjustment for delay is warranted in this case.

Finally, the associated attorneys claimed in their motion for leave to supplement the record with information relative to the lodestar approach that they were unaware that the court was considering awarding a fixed fee. As discussed in the procedural history of the case, this intention was made clear in two prior orders filed by this court approximately one year before the associated attorneys filed their motion to supplement. This objection therefore is unfounded.

## II. *Attorneys' expenses*

Mr. Weissbrodt seeks reimbursement for expenses totalling $75,205.44. In order for an attorney to recover expenses for services rendered, "[t]he petition for reimbursable expenses shall be itemized showing time, place, purpose and amount of each item incurred or paid by the applicants, and as to items paid by or on behalf of the applicants there shall be filed with the petition, receipts or other evidences of payment...." 25 C.F.R. § 503.34b(a) (1979). The documentation submitted in support of Mr. Weissbrodt's motion shows nine categories of expenses:

| | | |
|---|---|---|
| A. | Purchase of Materials and Services: | $ 1,299.01 |
| B. | Expert Assistance: | |
| | 1. Berman, Goldman & Ribakow—Accountants | $13,105.00 |
| | 2. Nicklason Research Associates—Historians | $26,726.08 |
| | 3. William Woolford & Associates—Range Experts | $ 2,935.91 |
| | 4. Wesley Rickard, Inc.—Timber Experts | $ 6,226.50 |
| C. | Research Assistant | $12,786.36 |
| D. | Travel Expenses | $ 1,356.61 |
| E. | Stenographic, Typing & Clerical Services | $ 6,966.41 |
| F. | Long Distance Telephone | $ 500.10 |
| G. | Local Fares | $ 245.43 |
| H. | Duplication of Documents | $ 3,011.75 |
| I. | Extra Postage | $ 46.28 |
| | Total | $75,205.44 |

In support of these expenditures, Mr. Weissbrodt has submitted detailed records, including attorney affidavits, cancelled checks, invoices, ledger entries, receipts, and other documentation indicating the persons or firms providing the services and the dates and amounts paid for such services. The expenses are, on the whole, well documented and specifically designated as allocable to the Tribe.

The Tribe has claimed that some of the expert witness fees should not be allowed because they might have been paid out of an expert witness loan obtained by the Tribe from the Department of Interior. The loans, however, were obtained after the periods claimed by the associated attorneys. The court finds the documentation submitted sufficient to prove the amounts claimed. All expenses claimed will be allowed.

## CONCLUSION

I.S. Weissbrodt's motion for attorneys' fees and expenses is granted to the following extent: The court awards the associated attorneys a fee of $200,000.00 for services rendered to the Tribe in the prosecution of Docket No. 22–H, plus expenses, for a total award of $275,205.44. The Clerk of the Court shall enter judgment accordingly.

**IT IS SO ORDERED.**